SCHENCK ET AL. *v.* PRO-CHOICE NETWORK OF
WESTERN NEW YORK ET AL.

No. 95–1065.   Argued October 16, 1996—Decided February 19, 1997

*Jay Alan Sekulow* argued the cause for petitioners. With him on the briefs were *Vincent P. McCarthy, Joseph P. Secola, Thomas P. Monaghan, James M. Henderson, Sr., Walter M. Weber, Keith A. Fournier,* and *John G. Stepanovich.*

*Lucinda M. Finley* argued the cause for respondents. With her on the brief were *Martha F. Davis* and *Deborah A. Ellis.*

*Acting Solicitor General Dellinger* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Assistant Attorney General Patrick, Deputy Solicitor General Bender, Beth S. Brinkmann,* and *Jessica Dunsay Silver.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union Foundation of Florida, Inc., et al. by *James K. Green* and *Richard A. Waples;* for the Family Research Council by *Cathleen A. Cleaver;* for Liberty Counsel by *Mathew D. Staver;* and for the Rutherford Institute by *Anne-Marie Amiel* and *John W. Whitehead.*

Briefs of *amici curiae* urging affirmance were filed for the State of Connecticut et al. by *Richard Blumenthal,* Attorney General of Connecticut, and *Jennifer C. Jaff,* Assistant Attorney General, joined by the Attorneys General for their respective jurisdictions as follows: *Gale A. Norton*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented is whether an injunction that places restrictions on demonstrations outside abortion clinics violates the First Amendment. We uphold the provisions imposing "fixed bubble" or "fixed buffer zone" limitations, as hereinafter described, but hold that the provisions imposing "floating bubble" or "floating buffer zone" limitations violate the First Amendment.

I

Respondents include three doctors and four medical clinics (two of which are part of larger hospital complexes) in and around Rochester and Buffalo in upstate New York. These health care providers perform abortions and other medical services at their facilities. The eighth respondent is Pro-Choice Network of Western New York, a not-for-profit cor-

of Colorado, *Robert A. Butterworth* of Florida, *Calvin E. Holloway, Sr.,* of Guam, *Margery S. Bronster* of Hawaii, *Pamela Carter* of Indiana, *Carla J. Stovall* of Kansas, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *Deborah T. Poritz* of New Jersey, *Tom Udall* of New Mexico, *Frankie Sue Del Papa* of Nevada, *Michael F. Easley* of North Carolina, *Theodore R. Kulongoski* of Oregon, *Jeffrey L. Amestoy* of Vermont, *Christine O. Gregoire* of Washington, and *Darrell V. McGraw, Jr.,* of West Virginia; for the State of New York by *Dennis C. Vacco,* Attorney General, *Victoria A. Graffeo,* Solicitor General, *Barbara G. Billet,* Deputy Solicitor General, and *Robert A. Forte,* Assistant Attorney General; for the City of Phoenix, Arizona, by *David A. Strauss, Roderick G. McDougall,* and *Marvin A. Sondag;* for the American Civil Liberties Union et al. by *Steven R. Shapiro, Marjorie Heins, Elliot Mincberg,* and *Lois Waldman;* for the American College of Obstetricians and Gynecologists et al. by *Elaine Metlin, Laura B. Feigin, Ann E. Allen, Roger K. Evans,* and *Eve W. Paul;* for the Feminist Majority Foundation et al. by *Talbot D'Alemberte;* and for the American Medical Women's Association et al. by *Eve C. Gartner.*

Briefs of *amici curiae* were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, Marsha S. Berzon,* and *Laurence Gold;* and for the Life Legal Defense Foundation by *Anne J. Kindt.*

poration dedicated to maintaining access to family planning and abortion services.

On September 24, 1990, respondents filed a complaint in the District Court for the Western District of New York against 50 individuals and 3 organizations—Operation Rescue, Project Rescue Western New York, and Project Life of Rochester. The complaint alleged that defendants had consistently engaged in illegal blockades and other illegal conduct at facilities in the Western District of New York where abortions were performed. (For convenience, we refer to these facilities as "clinics" throughout.) The complaint alleged one federal and six state causes of action: conspiracy to deprive women seeking abortions or other family planning services of the equal protection of the laws, in violation of Rev. Stat. § 1980, 42 U. S. C. § 1985(3); discrimination against and harassment of women seeking abortions and other family planning services, in violation of N. Y. Civ. Rights Law § 40–c (McKinney 1992) and N. Y. Exec. Law § 296 (McKinney 1993); trespass; tortious interference with business; tortious harassment; false imprisonment; and intentional infliction of emotional harm. The complaint alleged that a large blockade was planned for September 28, and requested that the court issue a temporary restraining order (TRO) to stop it. The complaint also sought a permanent injunction and damages.

Before the complaint was filed, the clinics were subjected to numerous large-scale blockades in which protesters would march, stand, kneel, sit, or lie in parking lot driveways and in doorways. This conduct blocked or hindered cars from entering clinic parking lots, and patients, doctors, nurses, and other clinic employees from entering the clinics.

In addition to these large-scale blockades, smaller groups of protesters consistently attempted to stop or disrupt clinic operations. Protesters trespassed onto clinic parking lots and even entered the clinics themselves. Those trespassers who remained outside the clinics crowded around cars or

milled around doorways and driveway entrances in an effort to block or hinder access to the clinics. Protesters sometimes threw themselves on top of the hoods of cars or crowded around cars as they attempted to turn into parking lot driveways. Other protesters on clinic property handed literature and talked to people entering the clinics—especially those women they believed were arriving to have abortions—in an effort to persuade them that abortion was immoral. Sometimes protesters used more aggressive techniques, with varying levels of belligerence: getting very close to women entering the clinics and shouting in their faces; surrounding, crowding, and yelling at women entering the clinics; or jostling, grabbing, pushing, and shoving women as they attempted to enter the clinics. Male and female clinic volunteers who attempted to escort patients past protesters into the clinics were sometimes elbowed, grabbed, or spit on. Sometimes the escorts pushed back. Some protesters remained in the doorways after the patients had entered the clinics, blocking others from entering and exiting.

On the sidewalks outside the clinics, protesters called "sidewalk counselors" used similar methods. Counselors would walk alongside targeted women headed toward the clinics, handing them literature and talking to them in an attempt to persuade them not to get an abortion. Unfortunately, if the women continued toward the clinics and did not respond positively to the counselors, such peaceful efforts at persuasion often devolved into "in your face" yelling, and sometimes into pushing, shoving, and grabbing. Men who accompanied women attempting to enter the clinics often became upset by the aggressive sidewalk counseling and sometimes had to be restrained (not always successfully) from fighting with the counselors.

The District Court found that the local police had been "unable to respond effectively" to the protests, for a number of reasons: the protests were constant, overwhelming police resources; when the police arrived, the protesters simply dis-

persed and returned later; prosecution of arrested protesters was difficult because patients were often reluctant to cooperate for fear of making their identity public; and those who were convicted were not deterred from returning to engage in unlawful conduct. In addition, the court found that defendants harassed the police officers verbally and by mail, including the deputy police chief. Also harassed were people who testified against the protesters and "those who invoke[d] legal process against" the protesters. This, testified the deputy police chief, "made it more difficult for him to do his job." *Pro-Choice Network of Western N. Y. v. Project Rescue Western N. Y.*, 799 F. Supp. 1417, 1426–1427 (WDNY 1992). See also *id.*, at 1431 ("[T]here has been substantial uncontradicted evidence that defendants' activities are intended, and do in fact, prevent and hinder local police from protecting the right of women to choose to have an abortion").

On September 27, 1990, three days after respondents filed their complaint and one day before the scheduled large-scale blockade, the District Court issued a TRO. The parties stipulated that the TRO might remain in force until decision on respondents' motion for a preliminary injunction. In pertinent part, the TRO enjoined defendants from physically blockading the clinics, physically abusing or tortiously harassing anyone entering or leaving the clinics, and "demonstrating within 15 feet of any person" entering or leaving the clinics. As an exception to this 15-foot "buffer zone" around people, the TRO allowed two sidewalk counselors to have "a conversation of a nonthreatening nature" with individuals entering or leaving the clinic. If the individuals indicated that they did not want the counseling, however, the counselors had to "cease and desist" from counseling.[1]

---

[1] Although the TRO (and the preliminary injunction) states that the "cease and desist" provision is triggered whenever the individual "wants to not have counseling," the District Court has construed this provision to apply only if "the targeted person or group of persons indicates, either

At first, defendants complied with the TRO, holding a peaceful demonstration rather than the scheduled blockade. Subsequently, they stipulated that "physical blockades" could be enjoined, and they conducted no such blockades between the issuance of the TRO and the issuance of the preliminary injunction 17 months later. Defendants, however, continued to engage in protests that the District Court labeled "constructive blockades," as well as sidewalk counseling. Constructive blockades consisted of "demonstrating and picketing around the entrances of the clinics, and . . . harassing patients and staff entering and leaving the clinics." *Id.*, at 1424. This included many of the protest elements described above, including attempts to intimidate or impede cars from entering the parking lots, congregating in driveway entrances, and crowding around, yelling at, grabbing, pushing, and shoving people entering and leaving the clinics. The purpose of constructive blockades was the same as physical blockades: "to prevent or dissuade patients from entering the clinic." *Ibid.* Clinic volunteer escorts testified that the protests were much quieter, calmer, and smaller during the first month after the TRO issued, but that the protests returned to their prior intensity thereafter, including aggressive sidewalk counseling with occasional shoving and elbowing, trespassing into clinic buildings to continue counseling of patients, and blocking of doorways and driveways.

Alleging that Project Rescue and five individual defendants (including petitioner Schenck) breached the TRO on five separate occasions from late October 1990 through December 1990, respondents sought four contempt citations. A fifth contempt citation for a 1991 incident was sought against petitioner Schenck and another individual defendant. Throughout 1991 and into 1992, the District Court held 27 days of hearings in these contempt proceedings, and issued opinions

---

verbally or non-verbally, that they do not wish to be counseled." 799 F. Supp., at 1434. See also 67 F. 3d 377, 391 (CA2 1995) (same).

concluding that five of the six incidents justified a finding of civil contempt.[2]

In February 1992, after hearing 12 additional days of testimony, the District Court issued the injunction, parts of which are challenged here. The relevant provisions are set forth in the margin.[3] Although the injunction largely

---

[2] Respondents filed other contempt motions after the District Court issued its preliminary injunction. Since we are only concerned with the propriety of the injunction, we consider only the evidence that was before the court when it issued the injunction.

[3] "[D]efendants, the officers, directors, agents, and representatives of defendants, and all other persons whomsoever, known or unknown, acting in their behalf or in concert with them, and receiving actual or constructive notice of this Order, are:

"1. Enjoined and restrained in any manner or by any means from:

"(a) trespassing on, sitting in, blocking, impeding, or obstructing access to, ingress into or egress from any facility, including, but not limited to, the parking lots, parking lot entrances, driveways, and driveway entrances, at which abortions are performed in the Western District of New York;

"(b) demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities, or within fifteen feet of any person or vehicle seeking access to or leaving such facilities, except that the form of demonstrating known as sidewalk counseling by no more than two persons as specified in paragraph (c) shall be allowed;

"(c) physically abusing, grabbing, touching, pushing, shoving, or crowding persons entering or leaving, working at or using any services at any facility at which abortions are performed; provided, however, that sidewalk counseling consisting of a conversation of a non-threatening nature by not more than two people with each person or group of persons they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling, and that if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling, and shall thereafter be governed by the provisions of paragraph (b) pertaining to not demonstrating within fifteen feet of persons seeking access to or leaving a facility. In addition, it is further provided that this right to sidewalk counseling as defined herein shall not limit the right of the Police Department to maintain public order or such reasonably necessary

tracked the TRO, there were significant changes. First, while the TRO banned "demonstrating . . . within fifteen feet of any person" entering or leaving the clinics, the injunction more broadly banned "demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities" (fixed buffer zones), or "within fifteen feet of any person or vehicle seeking access to or leaving such facilities" (floating buffer zones). In addition, the injunction clarified the "cease and desist" provision, specifying that once sidewalk counselors who had entered the buffer zones were required to "cease and desist" their counseling, they had to retreat 15 feet from the people they had been counseling and had to remain outside the boundaries of the buffer zones.

In its opinion accompanying the preliminary injunction, the District Court stated the relevant inquiry as whether respondents had established (i) that they would be irreparably harmed if the injunction was not granted and (ii) that they were likely to succeed on the merits. The court held that the irreparable harm requirement was met, because "those women denied unimpeded access to [the clinics] cannot be compensated merely by money damages. Injunctive relief alone can assure women unimpeded access to [the] clinics." *Id.*, at 1428. The court also held that respondents were likely to succeed on at least three of their claims. First, relying on *New York State National Organization for*

rules and regulations as they decide are necessary at each particular demonstration site;

"(d) using any mechanical loudspeaker or sound amplification device or making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee of a health care facility at which abortions are performed, nor shall any person make such sounds which interfere with the rights of anyone not in violation of this Order;

"(e) attempting, or inducing, directing, aiding, or abetting in any manner, others to take any of the actions described in paragraphs (a) through (d) above." 799 F. Supp., at 1440–1441.

*Women* v. *Terry,* 886 F. 2d 1339 (CA2 1989), cert. denied, 495 U. S. 947 (1990), the court held that women seeking abortions constituted a protected class under 42 U. S. C. § 1985(3), and that their constitutional right to travel between States and to choose to have an abortion was likely infringed by defendants, in violation of § 1985(3). Second, the court held that the same conduct that infringed this class of women's constitutional rights under § 1985(3) "clearly violates N. Y. Civ. Rights Law § 40–c."[4] 799 F. Supp., at 1431. Finally, the court held that in light of the "overwhelming evidence that defendants have repeatedly trespassed upon [the clinics'] property in the past and may continue to trespass in the future," respondents had shown a likelihood of success on their trespass claim. *Id.,* at 1432. Having already found likelihood of success on these claims, the court chose not to address respondents' other four state-law claims. *Id.,* at 1432, n. 11.

---

[4] Nevertheless, in explaining why respondents were likely to succeed on this claim, the District Court used different language to describe respondents' § 40–c claim than it had used to describe respondents' § 1985(3) claim. Compare *id.,* at 1431 (§ 40–c: "defendants' conspiracy is intended to deprive women of their constitutional rights to travel and to choose to have an abortion, and subjects them to harassment when they seek to exercise those rights"), with *id.,* at 1430 (§ 1985(3): "[defendants are] engaging in a conspiracy . . . against a cognizable class of persons, with invidious class-based animus[,] . . . [they are] committing overt acts in furtherance of the conspiracy[,] . . . [and the] conspiracy infringes two constitutional rights of women seeking abortions"). This was presumably to track the different language of § 40–c. Compare N. Y. Civ. Rights Law § 40–c(2) (McKinney 1992) ("No person shall, because of . . . sex . . . be subjected to any discrimination in his civil rights, or to any harassment . . . in the exercise thereof, by any other person . . .") with 42 U. S. C. § 1985(3) ("If two or more persons . . . conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of the laws . . . [and] one or more persons engaged therein do . . . any act in furtherance of the object of such conspiracy, whereby another is . . . deprived of having and exercising any right or privilege of a citizen of the United States, the party so . . . deprived may have an action for the recovery of damages . . .").

In analyzing defendants' assertion that the injunction violated their First Amendment right to free speech, the court applied our standard "time, place, and manner analysis," asking whether the speech restrictions in the injunction (i) were content neutral, (ii) were narrowly tailored to serve a significant government interest, and (iii) left open ample alternative channels for communication of the information. *Id.*, at 1432 (citing *Frisby* v. *Schultz*, 487 U. S. 474, 481 (1988)). The court held that the injunction was content neutral because "it merely restricts the volume, location, timing and harassing and intimidating nature of defendants' expressive speech." 799 F. Supp., at 1433. The court held that the injunction served three significant governmental interests—public safety, ensuring that abortions are performed safely, and ensuring that a woman's constitutional rights to travel interstate and to choose to have an abortion were not sacrificed in the interest of defendants' First Amendment rights.[5]

As to narrow tailoring, the court explained that the 15-foot buffer zones "around entrances and . . . around people and vehicles seeking access . . . are necessary to ensure that people and vehicles seeking access to the clinics will not be impeded, and will be able to determine readily where the entrances are located." *Id.*, at 1434. The court added that the buffer zones would also provide the benefit of "prevent[ing] defendants from crowding patients and invading their personal space." *Ibid.* The court explained the "cease and desist" provision—allowing two sidewalk counselors inside the buffer zones but requiring them to "cease and desist" their counseling if the counselee asked to be left alone—as

---

[5] The court noted that although defendants had stipulated to the entry of "an injunction against 'blocking or obstructing' access" to the clinics and against trespassing on clinic property "for the purpose of 'blocking or obstructing" access, the injunction's terms were "more comprehensive" than the term "blocking or obstructing access." A broader injunction was justified in this case, said the court, because it was "better tailored to the evidence." 799 F. Supp., at 1433.

"an exception" to the buffer zones and as "an attempt to accommodate fully defendants' First Amendment rights." *Ibid.* The court held that this provision was "necessary in order to protect the right of people approaching and entering the facilities to be left alone." *Id.*, at 1435. Finally, the court held that the injunction left open ample alternative channels for communication, because defendants could still "picket, carry signs, pray, sing or chant in full view of people going into the clinics." *Id.*, at 1437.

After the District Court issued its opinion, we held in *Bray* v. *Alexandria Women's Health Clinic*, 506 U. S. 263, 269 (1993), that "women seeking an abortion" were not a protected class under 42 U. S. C. § 1985(3). In light of *Bray*, the District Court dismissed respondents' § 1985(3) claim, with leave to file an amended § 1985(3) cause of action. *Pro-Choice Network of Western N. Y.* v. *Project Rescue Western N. Y.*, 828 F. Supp. 1018, 1025 (WDNY 1993). The court then decided to exercise pendent jurisdiction over respondents' remaining causes of action (the six state claims), regardless of the ultimate disposition of the § 1985(3) claim. In so deciding, the court noted that "the preliminary injunction is grounded not only on the § 1985(3) claim, but two state-law claims [the N. Y. Civ. Rights Law § 40-c claim and the trespass claim] as well." *Id.*, at 1026, n. 4. The court explained that judicial economy, convenience, and fairness all suggested that it keep the case, since it had expended substantial resources on the case and its involvement in the case was ongoing. *Id.*, at 1028–1029 (citing the contempt motions filed by respondents in 1990 and 1991, criminal contempt charges brought against six individuals for protests in 1992, and civil and criminal contempt motions filed in 1993).

Petitioners, two individual defendants, appealed to the Court of Appeals for the Second Circuit. While the case was on appeal, we decided *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753 (1994), a case which also involved the effect of an injunction on the expressive activities of anti-

abortion protesters. (We discuss *Madsen* in greater depth in Part II–A, *infra.*) We held that "our standard time, place, and manner analysis is not sufficiently rigorous" when it comes to evaluating content-neutral *injunctions* that restrict speech. The test instead, we held, is "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." 512 U. S., at 765.

Applying *Madsen*, a panel of the Court of Appeals reversed the District Court in a split decision. 67 F. 3d 359 (1994). The Court of Appeals then heard the case en banc, and affirmed the District Court by a divided vote. 67 F. 3d 377 (1995). Each of two opinions garnered a majority of the court. Judge Oakes' lead opinion, joined by eight other judges, affirmed for reasons that closely track the reasoning of the District Court. *Id.*, at 388–392. A concurring opinion by Judge Winter, joined by nine other judges, affirmed primarily on the ground that the protesters' expressive activities were not protected by the First Amendment at all, and because the District Court's injunction was a "reasonable response" to the protesters' conduct. *Id.*, at 396, 398. We granted certiorari. 516 U. S. 1170 (1996).

## II

### A

Petitioners challenge three aspects of the injunction: (i) the floating 15-foot buffer zones around people and vehicles seeking access to the clinics; (ii) the fixed 15-foot buffer zones around the clinic doorways, driveways, and parking lot entrances; and (iii) the "cease and desist" provision that forces sidewalk counselors who are inside the buffer zones to retreat 15 feet from the person being counseled once the person indicates a desire not to be counseled. Because *Madsen* bears many similarities to this case and because many of the parties' arguments depend on the application of *Madsen* here, we review our determination in that case.

A Florida state court had issued a permanent injunction enjoining specified organizations and individuals from blocking or interfering with clinic access and from physically abusing people entering or leaving the clinic. Six months after the injunction issued, the court found that protesters still impeded access by demonstrating on the street and in the driveways, and that sidewalk counselors approached entering vehicles in an effort to hand literature to the occupants. In the face of this evidence, the court issued a broader injunction that enjoined the defendant protesters from " 'physically abusing, grabbing, intimidating, harassing, touching, pushing, shoving, crowding or assaulting' " anyone entering or leaving the clinic; from " 'congregating, picketing, patrolling, demonstrating or entering that portion of public right-of-way or private property within [36] feet of the property line of the Clinic' "; from approaching anyone " 'seeking the services of the Clinic' " who is within 300 feet of the clinic, unless the person " 'indicates a desire to communicate' "; and from making any noise or displaying any image which could be heard or seen inside the clinic. 512 U. S., at 759–760.

After determining that the injunction was not a prior restraint and was content neutral, *id.*, at 762–764, we held that the proper test for evaluating content-neutral injunctions under the First Amendment was "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest," *id.*, at 765. The Florida Supreme Court had concluded that the injunction was based on a number of governmental interests: protecting a woman's freedom to seek pregnancy-related services, ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting the medical privacy of patients whose psychological and physical well-being were threatened as they were held "captive" by medical circumstance. *Id.*, at 767–768. We held that the combination of these interests was "quite sufficient to justify an appropriately tailored in-

junction" to protect unimpeded access to the clinic by way of public streets and sidewalks. *Id.*, at 768.

We held that some of the injunction's provisions burdened more speech than necessary to serve these interests, and that others did not. We upheld the 36-foot buffer zone as applied to the street, sidewalks, and driveways "as a way of ensuring access to the clinic." We explained that the trial court had few other options to protect access to the clinic: Allowing protesters to remain on the sidewalks and in the clinic driveway was not a valid option because of their past conduct, and allowing them to stand in the street was obviously impractical. In addition, we stated that "some deference must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review." *Id.*, at 769–770 (citing *Milk Wagon Drivers* v. *Meadowmoor Dairies, Inc.*, 312 U. S. 287, 294 (1941)).

We struck down the 300-foot no-approach zone around the clinic, however, stating that it was difficult

> "to justify a prohibition on *all* uninvited approaches . . . regardless of how peaceful the contact may be . . . . Absent evidence that the protesters' speech is independently proscribable (*i. e.*, 'fighting words' or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, see *Milk Wagon Drivers*, 312 U. S., at 292–293, this provision cannot stand. 'As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.' *Boos* v. *Barry*, 485 U. S. [312, 322 (1988)] (internal quotation marks omitted). The 'consent' requirement alone invalidates this provision; it burdens more speech than is necessary to prevent intimidation and to ensure access to the clinic." 512 U. S., at 774.

We now apply *Madsen* to the challenged provisions of the injunction and ask whether they burden more speech than necessary to serve a significant governmental interest.[6]

## B

Petitioners first argue that there are no significant governmental interests that support the injunction. The argument goes as follows: Of the seven causes of action in respondents' complaint, the only one left standing after the District Court's most recent opinion is respondents' trespass claim; a trespass cause of action can support an injunction banning trespass, but nothing else; thus, the injunction's provisions banning "demonstrating" within 15 feet of people, cars, and entrances are overbroad.

First, this argument is factually incorrect. The trespass claim is not the only one left standing at this point. In its opinion issuing the preliminary injunction, the District Court held that the conduct that satisfied the elements of a § 1985(3) claim under federal law also satisfied the elements of a § 40–c claim under state law. After our decision in *Bray*, the District Court dismissed respondents' § 1985(3) claim. Petitioners argue that in doing so, the District Court necessarily and implicitly dismissed the § 40–c claim as well, since the two claims were based on the same conduct. But our opinion in *Bray* did not attempt to construe any statute other than § 1985(3). And the fact that certain conduct does not state a claim under § 1985(3) does not necessarily mean that the same conduct does not state a claim under a state

---

[6] Petitioners argue that the injunction is an unlawful prior restraint and that the standard we set out in *Madsen* is therefore inapplicable. Because we rejected this argument in *Madsen* and because petitioners make no effort to distinguish *Madsen* on this ground, we reject it again. As in *Madsen*, alternative channels of communication were left open to the protesters, and "the injunction was issued not because of the content of [the protesters'] expression, . . . but because of their prior unlawful conduct." *Madsen*, 512 U. S., at 764, n. 2.

law that uses the same or similar language as § 1985(3), since state courts may of course choose to construe their own law more broadly (or more narrowly) than its federal counterpart. In any event, the language of the two statutes is noticeably different. See n. 4, *supra.* Thus, the dismissal of the § 1985(3) claim in light of *Bray* did not also act as a dismissal of respondents' § 40–c claim. This is confirmed by the District Court's comment in its post-*Bray* opinion that "the preliminary injunction is grounded not only on the § 1985(3) claim, but two state-law claims as well." 828 F. Supp., at 1026, n. 4.

Although petitioners contend that the § 40–c cause of action is no longer valid simply because the § 1985(3) claim is no longer valid, an argument we reject, they do not contend that the District Court erred in concluding as an independent matter that respondents were likely to succeed on their § 40–c and trespass claims. See Brief for Petitioners 32. The injunction's terms are clearly crafted to remedy these violations.

An injunction tailored to respondents' claims for relief may nonetheless violate the First Amendment. In making their First Amendment challenge, petitioners focus solely on the interests asserted by respondents in their complaint. But in assessing a First Amendment challenge, a court looks not only at the private claims asserted in the complaint, but also inquires into the governmental interests that are protected by the injunction, which may include an interest in public safety and order. *Madsen,* 512 U. S., at 767–768; *Milk Wagon Drivers, supra,* at 294–295. Both the injunction in *Madsen* and the injunction here are supported by this governmental interest. In *Madsen,* it was permissible to move protesters off the sidewalk and to the other side of the street in part because other options would block the free flow of traffic on the streets and sidewalks. 512 U. S., at 767–768. Here, the District Court cited public safety as one of the interests justifying the injunction—certainly a reasonable

conclusion, if only because of the dangerous situation created by the interaction between cars and protesters and because of the fights that threatened to (and sometimes did) develop. Even though the governmental interest in public safety is clearly a valid interest here, as it was in *Madsen,* plaintiffs in neither case pleaded a claim for "threat to public safety." Indeed, this would be a strange concept, since a plaintiff customarily alleges violations of private rights, while "public safety" expresses a public right enforced by the government through its criminal laws and otherwise. Thus, the fact that "threat to public safety" is not listed anywhere in respondents' complaint as a claim does not preclude a court from relying on the significant governmental interest in public safety in assessing petitioners' First Amendment argument.[7]

Given the factual similarity between this case and *Madsen,* we conclude that the governmental interests underlying the injunction in *Madsen*—ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services,[8] *ibid.*—also underlie the injunction here, and in combination are certainly significant enough to justify an appropriately tailored injunction to secure unimpeded physical access to the clinics.

---

[7] JUSTICE SCALIA in dissent contends that the District Court's reliance on "public safety" was not permissible because only the government may seek an injunction based on that factor. But the District Court's reliance on this factor was not to use it as an element which supported respondents' claim for an injunction. Rather, the court used this factor as a basis for rejecting petitioners' challenge to the injunction on First Amendment grounds.

[8] We need not decide whether the governmental interest in protecting the medical privacy and well-being of patients "held 'captive' by medical circumstance"—at issue in *Madsen*—is implicated here. That interest was relevant in *Madsen* because patients *while inside the clinic* heard the chanting and shouting of the protesters and suffered increased health risks as a result. See *id.,* at 772. Here, although the District Court found that the loud voices of sidewalk counselors could be heard inside the clinic, petitioners do not challenge the injunction's ban on excessive noise.

## C

We strike down the floating buffer zones around people entering and leaving the clinics because they burden more speech than is necessary to serve the relevant governmental interests. The floating buffer zones prevent defendants— except for two sidewalk counselors, while they are tolerated by the targeted individual—from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks. This is a broad prohibition, both because of the type of speech that is restricted and the nature of the location. Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum. See, *e. g., Boos* v. *Barry*, 485 U. S. 312, 322 (1988); *United States* v. *Grace*, 461 U. S. 171, 180 (1983). On the other hand, we have before us a record that shows physically abusive conduct, harassment of the police that hampered law enforcement, and the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct. In some situations, a record of abusive conduct makes a prohibition on classic speech in limited parts of a public sidewalk permissible. See, *e. g.,* Part II–D, *infra; Madsen, supra,* at 769–770. We need not decide whether the governmental interests involved would ever justify some sort of zone of separation between individuals entering the clinics and protesters, measured by the distance between the two. We hold here that because this broad prohibition on speech "floats," it cannot be sustained on this record.

Since the buffer zone floats, protesters on the public sidewalks who wish (i) to communicate their message to an incoming or outgoing patient or clinic employee and (ii) to remain as close as possible (while maintaining an acceptable conversational distance) to this individual, must move as the

individual moves, maintaining 15 feet of separation. But this would be difficult to accomplish at, for instance, the GYN Womenservices clinic in Buffalo, one of the respondent clinics. The sidewalk outside the clinic is 17-feet wide. This means that protesters who wish to walk alongside an individual entering or leaving the clinic are pushed into the street, unless the individual walks a straight line on the outer edges of the sidewalk. Protesters could presumably walk 15 feet behind the individual, or 15 feet in front of the individual while walking backwards. But they are then faced with the problem of watching out for other individuals entering or leaving the clinic who are heading the opposite way from the individual they have targeted. With clinic escorts leaving the clinic to pick up incoming patients and entering the clinic to drop them off, it would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction.[9] This lack of certainty leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits. That is, attempts to stand 15 feet from someone entering or leaving a clinic and to communicate a message—certainly protected on the face of the injunction—will be hazardous if one wishes to remain in compliance with the injunction.[10] Since there may well be other

---

[9] We suspect that these floating buffer zones would also be quite difficult for a district court to enforce. Contempt proceedings would likely focus on whether protesters who thought they were keeping pace with the targeted individual from a distance of 15 feet actually strayed to within 14 or 13 feet of the individual for a certain period of time.

[10] Significantly, the District Judge himself expressed this same concern at the September 27 TRO hearing, stating his understanding that a "moving" buffer zone would be quite infeasible. Nevertheless, the terms of the TRO and the injunction provide exactly that, and the District Court never authoritatively put a limiting construction on the injunction.

JUSTICE BREYER in dissent places great stress on the District Court's statement at this September 27 hearing, and concludes that the District

ways to both effect such separation and yet provide certainty (so that speech protected by the injunction's terms is not burdened), we conclude that the floating buffer zones burden more speech than necessary to serve the relevant governmental interests. Because we strike down the floating buffer zones, we do not address the constitutionality of the "cease and desist" provision that allows sidewalk counselors within those buffer zones.

---

Court never understood the TRO, or even the injunction, to contain floating buffer zones. We believe JUSTICE BREYER misreads the record.

First, despite the District Court's statements at the September 27 hearing, the court held petitioner Schenck and one other defendant in contempt for violating paragraph 1(a) of the TRO, because they came within 15 feet of an individual attempting to enter the clinic even though they were more than 15 feet from any doorway or driveway entrance to the clinic. See *Pro-Choice Network of Western N. Y. v. Project Rescue Western N. Y.*, No. 90–CV–1004A (WDNY, Sept. 28, 1992), pp. 7–8, 20–21 (doctor parked several hundred feet from clinic and then attempted to walk on sidewalk toward clinic; contemnors followed doctor the length of the sidewalk, yelling at him from a distance of only a few feet, up until the point where doctor was 10 to 20 feet from clinic driveway entrance; court held that this conduct violates the TRO's "proscription against demonstrating within fifteen feet of any person seeking access to a clinic"). Thus, we conclude that the District Court read the TRO the way an ordinary person would—to create a floating buffer zone.

Second, the District Court's opinion accompanying the issuance of the preliminary injunction shows that the court interpreted the injunction to contain floating buffer zones. The court described paragraph (b) of the injunction as "setting *dual* 'clear zones' of fifteen feet around entrances *and fifteen feet around people and vehicles seeking access*." 799 F. Supp., at 1434 (emphasis added). And the injunction by its terms bans "demonstrating" within 15 feet of clinic entrances "*or* within fifteen feet of any person or vehicle seeking access to [the clinic]." (Emphasis added.)

Finally, we note that no judge of the en banc Court of Appeals expressed doubt that the injunction included floating buffer zones, cf. 67 F. 3d, at 389, n. 4 (discussing "how far from a clinic a floating buffer zone may reach," not, as JUSTICE BREYER suggests, whether the injunction creates floating buffer zones at all), and that none of the parties before us has suggested that the injunction does not provide for such zones.

We likewise strike down the floating buffer zones around vehicles. Nothing in the record or the District Court's opinion contradicts the commonsense notion that a more limited injunction—which keeps protesters away from driveways and parking lot entrances (as the fixed buffer zones do) and off the streets, for instance—would be sufficient to ensure that drivers are not confused about how to enter the clinic and are able to gain access to its driveways and parking lots safely and easily. In contrast, the 15-foot floating buffer zones would restrict the speech of those who simply line the sidewalk or curb in an effort to chant, shout, or hold signs peacefully. We therefore conclude that the floating buffer zones around vehicles burden more speech than necessary to serve the relevant governmental interests.

## D

We uphold the fixed buffer zones around the doorways, driveways, and driveway entrances. These buffer zones are necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic parking lots can do so. As in *Madsen*, the record shows that protesters purposefully or effectively blocked or hindered people from entering and exiting the clinic doorways, from driving up to and away from clinic entrances, and from driving in and out of clinic parking lots. Based on this conduct—both before and after the TRO issued—the District Court was entitled to conclude that the only way to ensure access was to move back the demonstrations away from the driveways and parking lot entrances. Similarly, sidewalk counselors—both before and after the TRO—followed and crowded people right up to the doorways of the clinics (and sometimes beyond) and then tended to stay in the doorways, shouting at the individuals who had managed to get inside. In addition, as the District Court found, defendants' harassment of the local police made it far from certain that the police would be able to quickly and effectively counteract protesters who blocked doorways

or threatened the safety of entering patients and employees. Based on this conduct, the District Court was entitled to conclude that protesters who were allowed close to the entrances would continue right up to the entrance, and that the only way to ensure access was to move *all* protesters away from the doorways.[11]  Although one might quibble about whether 15 feet is too great or too small a distance if the goal is to ensure access, we defer to the District Court's reasonable assessment of the number of feet necessary to keep the entrances clear.  See *Madsen*, 512 U. S., at 769–770 ("[S]ome deference must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review").

Petitioners claim that unchallenged provisions of the injunction are sufficient to ensure this access, pointing to the bans on trespassing, excessive noise, and "blocking, impeding or obstructing access to" the clinics.  They claim that in light of these provisions, the only effect of a ban on "demonstrating" within the fixed buffer zone is "a ban on peaceful, nonobstructive demonstrations on public sidewalks or rights of way."  Brief for Petitioners 47.  This argument, however, ignores the record in this case.  Based on defendants' past conduct, the District Court was entitled to conclude that some of the defendants who were allowed within 5 to 10 feet

---

[11] The fact that the injunction allows two sidewalk counselors into the fixed buffer zones—subject to the "cease and desist" provision—does not detract from this conclusion.  It is clear from the District Court's opinion that its decision to allow two sidewalk counselors inside the buffer zones was an effort to bend over backwards to "accommodate" defendants' speech rights.  See 799 F. Supp., at 1434.  Because the District Court was entitled to conclude on this record that the only feasible way to shield individuals within the fixed buffer zone from unprotected conduct—especially with law enforcement efforts hampered by defendants' harassment of the police—would have been to keep the entire area clear of defendant protesters, the District Court's extra effort to enhance defendants' speech rights by allowing an exception to the fixed buffer zone should not redound to the detriment of respondents.

of clinic entrances would not merely engage in stationary, nonobstructive demonstrations but would continue to do what they had done before: aggressively follow and crowd individuals right up to the clinic door and then refuse to move, or purposefully mill around parking lot entrances in an effort to impede or block the progress of cars. And because defendants' harassment of police hampered the ability of the police to respond quickly to a problem, a prophylactic measure was even more appropriate. Cf. *Burson* v. *Freeman*, 504 U. S. 191, 206–207 (1992) (upholding 100-foot "no-campaign zone" around polling places: "Intimidation and interference laws fall short of serving a State's compelling interests because they 'deal with only the most blatant and specific attempts' to impede elections. Moreover, because law enforcement officers generally are barred [under state law] from the vicinity of the polls to avoid any appearance of coercion in the electoral process, many acts of interference would go undetected. These undetected or less than blatant acts may nonetheless drive the voter away before remedial action can be taken" (citations omitted)). The ban on "blocking, impeding, and obstructing access" was therefore insufficient by itself to solve the problem, and the fixed buffer zone was a necessary restriction on defendants' demonstrations.

Petitioners also argue that under *Madsen,* the fixed buffer zones are invalid because the District Court could not impose a "speech-restrictive" injunction (or TRO) without first trying a "non-speech-restrictive" injunction, as the trial court did in *Madsen.* But in *Madsen* we simply stated that the failure of an initial injunction "to accomplish its purpose may be taken into consideration" in determining the constitutionality of a later injunction. 512 U. S., at 770. The fact that the District Court's TRO included a "speech-restrictive" provision certainly does not mean that the subsequent injunction is automatically invalid. Since we can uphold the

injunction under the *Madsen* standard without this "consideration" being present, petitioners' argument fails.

Finally, petitioners make several arguments that may be quickly refuted. They argue that, unlike *Madsen*, there is "no extraordinary record of pervasive lawlessness," Brief for Petitioners 45, and that the buffer zones are therefore unnecessary. As explained above, our review of the record convinces us that defendants' conduct was indeed extraordinary, and that based on this conduct the District Court was entitled to conclude that keeping defendants away from the entrances was necessary to ensure access. Petitioners also argue that the term "demonstrating" is vague. When the injunction is read as a whole, see *Grayned* v. *City of Rockford*, 408 U. S. 104, 110 (1972), we believe that people "of ordinary intelligence" (and certainly defendants, whose demonstrations led to this litigation in the first place) have been given "a reasonable opportunity to know what is prohibited," *id.*, at 108.

Petitioners also contend that the "cease and desist" provision which limits the exception for sidewalk counselors in connection with the fixed buffer zone is contrary to the First Amendment. We doubt that the District Court's reason for including that provision—"to protect the right of the people approaching and entering the facilities to be left alone"— accurately reflects our First Amendment jurisprudence in this area. *Madsen* sustained an injunction designed to secure physical access to the clinic, but not on the basis of any generalized right "to be left alone" on a public street or sidewalk. As we said in *Madsen*, quoting from *Boos* v. *Barry*, 485 U. S., at 322, " '[a]s a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.' " 512 U. S., at 774. But as earlier noted, the entire exception for sidewalk counselors was an effort to en-

hance petitioners' speech rights, see n. 11, *supra,* and the "cease and desist" limitation must be assessed in that light.[12]

Petitioners and some of their *amici* attack the "cease and desist" provision accompanying the exception for sidewalk counselors as content based, because it allows a clinic patient to terminate a protester's right to speak based on, among other reasons, the patient's disagreement with the message being conveyed. But in *Madsen* we held that the injunction in that case was not content based, even though it was directed only at abortion protesters, because it was only abortion protesters who had done the acts which were being enjoined. Here, the District Court found that "[m]any of the

---

[12] Although petitioners argue that our disapproval of the 300-foot no-approach zone in *Madsen* requires disapproval of the "cease and desist" provision, *Madsen* is easily distinguishable ·on this point, since the no-approach zone was eight times broader than the "buffer zone" deemed necessary to ensure access to the clinic in *Madsen.*

JUSTICE SCALIA in dissent suggests that our failure to endorse the District Court's reason for including the "cease and desist" provision requires us to reverse the District Court's decision setting the injunction's terms. This suggestion is inconsistent with our precedents. See, *e. g., Rutan* v. *Republican Party of Ill.,* 497 U. S. 62, 76 (1990) ("[A]lthough we affirm the Seventh Circuit's judgment . . . , we do not adopt the Seventh Circuit's reasoning"); *Smith* v. *Phillips,* 455 U. S. 209, 215, n. 6 (1982) ("Respondent may, of course, defend the judgment below on any ground which the law and the record permit, provided the asserted ground would not expand the relief which has been granted"); *SEC* v. *Chenery Corp.,* 318 U. S. 80, 88 (1943) ("[W]e do not disturb the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason'" (quoting *Helvering* v. *Gowran,* 302 U. S. 238, 245 (1937)); *Langnes* v. *Green,* 282 U. S. 531, 536–537 (1931) ("[T]he entire record is before this court with power to review the action of the court of appeals and direct such disposition of the case as that court might have done upon the writ of error sued out for the review of the [district] court"); *Williams* v. *Norris,* 12 Wheat. 117, 120 (1827) (Marshall, C. J.) ("If the judgment [of the lower court] should be correct, although the reasoning, by which the mind of the Judge was conducted to it, should be deemed·unsound, that judgment would certainly be affirmed in [this] Court").

'sidewalk counselors' and other defendants ha[d] been arrested on more than one occasion for harassment, yet persist in harassing and intimidating patients, patient escorts and medical staff." 799 F. Supp., at 1425. These counselors remain free to espouse their message outside the 15-foot buffer zone, and the condition on their freedom to espouse it within the buffer zone is the result of their own previous harassment and intimidation of patients.[13]

*   *   *

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring in part and dissenting in part.

Instead of evaluating the injunction before us on the basis of the reasons for which it was issued, the Court today postulates other reasons that *might* have justified it and pronounces those never-determined reasons adequate. This is contrary to the settled practice governing appellate review of injunctions, and indeed of all actions committed by law to the initial factfinding, predictive and policy judgment of an entity other than the appellate court, see, *e. g., SEC* v. *Chenery Corp.*, 318 U. S. 80 (1943). The Court's opinion also claims for the judiciary a prerogative I have never heard of: the power to render decrees that are in its view justified by concerns for public safety, though not justified by the need

---

[13] The defendants, including the two petitioners, stipulated before the District Court that "[i]f [the District Court] concludes that some or all of the relief requested by plaintiffs should be granted on a preliminary injunctive basis, defendants will consent to the entry of such an injunction against each and every one of them." App. to Pet. for Cert. A–136.

to remedy the grievance that is the subject of the lawsuit. I dissent.

I

The most important holding in today's opinion is tucked away in the seeming detail of the "cease-and-desist" discussion in the penultimate paragraph of analysis: There is no right to be free of unwelcome speech on the public streets while seeking entrance to or exit from abortion clinics. *Ante*, at 383–384. "As we said in *Madsen* [v. *Women's Health Center, Inc.*, 512 U. S. 753 (1994)], quoting from *Boos* v. *Barry*, 485 U. S., at 322, '[a]s a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.'" *Ante*, at 383 (internal quotation marks omitted). But the District Court in this case (like the Court of Appeals) believed that there *was* such a right to be free of unwanted speech, and the validity of the District Court's action here under review cannot be assessed without taking that belief into account. That erroneous view of what constituted remediable harm shaped the District Court's injunction, and it is impossible to reverse on this central point yet maintain that the District Court framed its injunction to burden "no more speech than necessary," *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 765 (1994), to protect *legitimate* governmental interests.

The District Court justified the "fixed buffer" provision of the injunction on two separate grounds, each apparently tied to a different feature of the provision. First, the court said, the fixed buffer zone was "necessary to ensure that people . . . seeking access to the clinics will not be impeded." *Pro-Choice Network of Western New York* v. *Project Rescue Western New York*, 799 F. Supp. 1417, 1434 (WDNY 1992). And second, "the 'clear zones' will prevent defendants from crowding patients and invading their personal space." *Ibid.* Thus, the fixed buffer had a dual purpose: In order to prevent

physical obstruction of access, it excluded crowds of protesters from a 15-foot zone around clinic entrances, while permitting two nonobstructive "sidewalk counselors" to enter that zone. (Allowing a small number of protesters is a common practice in picketing injunctions, *e. g.,* *Mine Workers* v. *Bagwell,* 512 U. S. 821, 823 (1994), and of course a required practice when no more than that is necessary, see *Madsen, supra,* at 765.) And the second purpose of the fixed buffer provision, the purpose that justified the requirement that even the two nonobstructive sidewalk counselors "cease and desist" if the "targeted person" did not wish to hear them, was to assure "personal space" on the public streets—or, as the District Court described it in the next paragraph of its order, "to protect the right of people approaching and entering the facilities to be left alone." 799 F. Supp., at 1435.

The terms of the injunction's cease-and-desist provision make no attempt to conceal the fact that the supposed right to be left alone, and not the right of unobstructed access to clinics, was the basis for the provision:

> "*[N]o one is required to accept or listen to sidewalk counseling,* and . . . if anyone or any group of persons who is sought to be counseled *wants not to have counseling,* wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling, and shall thereafter be governed by the provisions of [the injunction] pertaining to not demonstrating within fifteen feet of persons seeking access to or leaving a facility." *Id.,* at 1440 (preliminary injunction, paragraph 1(c)) (emphasis added).

It is difficult to imagine a provision more dependent upon the right to be free of unwanted speech that today's opinion rejects as applied to public streets. The District Court's

own explanation of the provision makes that dependency even more starkly clear:

> "Th[e] 'cease and desist' provision is necessary in order to protect the right of people approaching and entering the facilities *to be left alone.*
>
> ". . . [Defendants] argue that, because their 'sidewalk counseling' occurs on a public sidewalk, they cannot be forced to cease communicating their message just because their audience may be *unwilling to hear it. The Court, however, rejects this argument.*
>
> ". . . The evidence adduced at the hearings clearly shows that, even when women seeking access to the clinics signal their desire to be left alone, defendants continue to follow right alongside them and persist in *communicating their message.* [W]omen seeking access to plaintiffs' facilities cannot, as a practical matter, escape *defendants' message.* . . .
>
> ". . . [T]he . . . 'cease and desist' provision advances the values of the marketplace of ideas by permitting listeners to exercise their autonomy to make their own determinations among competing ideas. *Once a women seeking access to one of the clinics has made a determination not to listen to defendants' message, defendants must respect her choice.*" *Id.,* at 1435–1436 (emphasis added).

## II

The District Court thought the supposed "right to be left alone" central enough to its order to devote two full pages in the federal reports to the subject, *ibid.,* and both majority opinions of the Court of Appeals discussed it *in extenso,* 67 F. 3d 377, 391–393 (CA2 1995); *id.,* at 395–397. The magic of today's opinion for this Court is that it renders this essential element of the injunction that was issued irrelevant by the simple device of approving instead an injunction that the

District Court (in the exercise of its discretion) chose *not* to issue—viz., an absolute ban on all protesters within the 15-foot zone. *Ante,* at 381, n. 11.

The Court asserts (in carefully selected words) that "the District Court *was entitled to conclude* that the only way to ensure access was to move back the demonstrations." *Ante,* at 380 (emphasis added). And again: "[T]he District Court *was entitled to conclude on this record* that the only feasible way to shield individuals within the fixed buffer zone from unprotected conduct . . . would have been to keep the entire area clear of defendant protesters." *Ante,* at 381, n. 11 (emphasis added). And (lest the guarded terminology be thought accidental), yet a third time: "Based on [the defendants'] conduct, the District Court *was entitled to conclude* . . . that the only way to ensure access was to move *all* protesters away from the doorways." *Ante,* at 381 (first emphasis added; second in original). But prior to the question whether it *was entitled to conclude that* is the question whether it *did conclude that.* We are not in the business (or never used to be) of making up conclusions that the trial court *could permissibly* have reached on questions involving assessments of fact, credibility, and future conduct—and then affirming on the basis of those posited conclusions, whether the trial court *in fact* arrived at them or not.[1] That is so even in ordinary cases, but it is doubly true when we review a trial court's order imposing a prior restraint upon speech. As we said in *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886 (1982), when a court decides to impose a speech-restrictive injunction, the conclusions it reaches must be "supported by findings that adequately disclose the[ir]

---

[1] The Court's lengthy citation of cases standing for the proposition that an appellate court can affirm on a *mandatory legal* ground different from that relied upon by the trial court, *ante,* at 384, n. 12, has no relevance to the question whether an appellate court can substitute its own assessments of past facts, of future probabilities, and hence of injunctive necessities, for the assessments made (and required to be made) by the trial court.

evidentiary basis . . . , that carefully identify the impact of [the defendants'] unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity." *Id.*, at 933–934.

The Court candidly concedes that the nonexistent "right to be left alone" underlay the District Court's imposition of the cease-and-desist provision. *Ante*, at 383. It appears not to grasp, however, the decisive import of this concession—which is that the District Court did not think it necessary to exclude *all* demonstrators from the buffer zone as a means of preventing physical obstruction of clinic entrances or other violations of law (other than the faux violation of intruding upon the speech targets' "private space"). Thus, the Court's statements about what "the District Court was entitled to conclude" are not only speculative (which is fatal enough) but positively contrary to the record of what the District Court *did* conclude—which was that permitting a few demonstrators within the buffer zone was perfectly acceptable, except when it would infringe the clinic employees' and patrons' right to be free of unwanted speech on public streets. In fact, the District Court expressly stated that if *in the future* it found that a complete ban on speech within the buffer zone *were* necessary, it would impose one. 799 F. Supp., at 1436, n. 13.

I do not grasp the relevance of the Court's assertions that admitting the two counselors into the buffer zone was "an effort to enhance petitioners' speech rights," *ante*, at 383–384, "an effort to bend over backwards to 'accommodate' defendants' speech rights," *ante*, at 381, n. 11, and that "the 'cease and desist' limitation must be assessed in that light," *ante*, at 384. If our First Amendment jurisprudence has stood for anything, it is that courts have *an obligation* "to enhance speech rights," and *a duty* "to bend over backwards to 'accommodate' speech rights." That principle was reaffirmed in *Madsen*, which requires that a judicial injunction against speech burden "no more speech than *necessary* to

serve a *significant* government interest." 512 U. S., at 765 (emphasis added). Thus, if the situation confronting the District Court *permitted* "accommodation" of petitioners' speech rights, it *demanded* it. The Court's effort to recharacterize this responsibility of special care imposed by the First Amendment as some sort of judicial gratuity is perhaps the most alarming concept in an opinion that contains much to be alarmed about.

## III

I disagree with the Court's facile rejection of the argument that no cause of action was properly found to support the present injunction. Petitioners contend that the only cause of action which could conceivably support the injunction is a trespass claim; but that cannot support the restrictions at issue, which are designed, as the District Court stated, to prevent obstruction of access and the invasion of "personal space," 799 F. Supp., at 1434, rather than to prevent trespass.

The Court responds by pointing out that the case contains a nontrespass claim under N. Y. Civ. Rights Law § 40–c(2) (McKinney 1992), which provides that "[n]o person shall, because of . . . sex . . . be subjected to any discrimination in his civil rights, or to any harassment . . . in the exercise thereof, by any other person." That is true enough, but it seems to me clear that that imaginative state-law claim cannot support a preliminary injunction because it does not have a probability of success on the merits. See 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.3 (2d ed. 1995). It is, to put it mildly, far from apparent that seeking to prevent both men and women from aborting both male and female human fetuses constitutes discrimination on the basis of sex. Moreover, the reasoning which led the District Court to conclude otherwise has been specifically rejected by this Court. The District Court wrote: "Having demonstrated a likelihood of success on the merits of their federal § 1985(3) claim, plaintiffs have also, by definition,

demonstrated a likelihood of success on their claim under N. Y. Civ. Rights Law § 40–c." 799 F. Supp., at 1431. Subsequently, however, this Court's opinion in *Bray* v. *Alexandria Women's Health Clinic*, 506 U. S. 263, 269–273 (1993), held that claims of the sort at issue here do *not* constitute discrimination on the basis of sex under 42 U. S. C. § 1985(3). Since there is also, as far as I have been able to determine, no decision by any New York court saying that they constitute sex discrimination under § 40–c, there is no basis on which the District Court could have concluded (or this Court could affirm) that the chance of success on this claim was anything other than a long shot.[2]

The Court proceeds from there to make a much more significant point: An injunction on speech may be upheld even if not justified on the basis of the interests asserted by the plaintiff, as long as it serves "public safety." "[I]n assessing a First Amendment challenge, a court . . . inquires into the governmental interests that are protected by the injunction, which may include an interest in public safety and order. . . . Here, the District Court cited public safety as one of the interests justifying the injunction . . . . [T]he fact that 'threat to public safety' is not listed anywhere in respondents' complaint as a claim does not preclude a court from relying on the significant governmental interest in public safety in assessing petitioners' First Amendment argument." *Ante*, at 375–376.

This is a wonderful expansion of judicial power. Rather than courts' being limited to according relief justified by the

---

[2] The Court contends that petitioners only raise the issue whether the § 40–c cause of action is "valid," and not the issue whether the District Court erred in concluding that the claim was "likely to succeed." *Ante*, at 375. The concept of an invalid claim that is likely to succeed is an interesting one, but there is no doubt that petitioners did not entertain it: They plainly challenged "[t]he district court's ruling that respondents were likely to prevail on their state antidiscrimination claim." Brief for Petitioners 32; see also *id.*, at 15.

complaints brought before them, the Court today announces that a complaint gives them, in addition, ancillary power to decree what may be necessary to protect—not the plaintiff, but *the public interest!* Every private suit makes the district judge a sort of one-man Committee of Public Safety. There is no precedent for this novel and dangerous proposition. In *Madsen*, the Court says, "it was permissible to move protesters off the sidewalk and to the other side of the street in part because other options would block the free flow of traffic on the streets and sidewalks." *Ante*, at 375; see also *Madsen*, 512 U. S., at 769. But acknowledging, as we did in *Madsen*, that some remedial options are eliminated because they conflict with considerations of public safety is entirely different from asserting, as the Court does today, that public safety can provide part of the *justification for the remedy*.[3] The only other case cited by the Court is *Milk Wagon Drivers* v. *Meadowmoor Dairies, Inc.*, 312 U. S. 287, 294–295 (1941). *Ante*, at 375. But *Milk Wagon Drivers* upheld an injunction against a union's intimidation of storekeepers, not because "the public interest" demanded it, but because the storekeepers were customers of the plaintiff dairy, which it was the purpose and effect of the intimidation to harm. 312 U. S., at 294–295.

We have in our state and federal systems a specific entity charged with responsibility for initiating action to guard the public safety. It is called the Executive Branch. When the public safety is threatened, that branch is empowered, by invoking judicial action and by other means, to provide protection. But the Judicial Branch has hitherto been thought powerless to act except as invited by someone other than itself. That is one of the reasons it was thought to be "the least dangerous to the political rights of the [C]onstitu-

---

[3] *Madsen* also refers to "public safety" as one of the government interests on which the state court relied in justifying the challenged injunction, 512 U. S., at 768, but nothing in our decision approved or relied upon that feature of the state court's approach.

tion"—because it "can take no active resolution whatever" and "may truly be said to have neither FORCE nor WILL, but merely judgment." The Federalist No. 78, p. 396 (M. Beloff ed. 1987). It is contrary to the most fundamental principles of separation of powers for the District Court to decree measures that would eliminate obstruction of traffic, in a lawsuit which has established nothing more than trespass.[4]

\* \* \*

Today's opinion makes a destructive inroad upon First Amendment law in holding that the validity of an injunction against speech is to be determined by an appellate court on the basis of what the issuing court might reasonably have found as to necessity, rather than on the basis of what it in fact found. And it makes a destructive inroad upon the separation of powers in holding that an injunction may contain measures justified by the public interest apart from remediation of the legal wrong that is the subject of the complaint. Insofar as the first point is concerned, the Court might properly have upheld the fixed buffer zone without the cease-and-desist provision, since the District Court evidently did conclude (with proper factual support, in my view) that limiting the protesters to two was necessary to prevent repe-

---

[4] The Court approves reliance on "public safety" not "as an element which supported respondents' claim for an injunction," but only "as a basis for rejecting petitioners' challenge to the injunction on First Amendment grounds." *Ante*, at 376, n. 7. Such a distinction makes no sense. In the context before us here, whether there is "a basis for rejecting petitioners' challenge to the injunction on First Amendment grounds" depends entirely on whether the "element[s] which suppor[t] the respondents' claim for an injunction" are strong enough. The issues are one and the same.

*Any* injunction must be justified by the elements that support it. The involvement of First Amendment rights does not alter that rule, but merely increases the degree of justification required. Of course, illogical or not, by simply saying so, the Court can limit its novel "public safety" rationale to injunctions involving the freedom of speech. But I would hardly consider that a small and unimportant area for the newly created judicial Committees of Public Safety to control.

tition of the obstruction of access that had occurred in the past. But even that more limited injunction would be invalidated by the second point: the fact that no cause of action related to obstruction of access was properly found to support the injunction. Accordingly, I join Parts I, II–A, and II–C, but dissent from the Court's judgment upholding the fixed buffer zone, and would reverse the decision of the Court of Appeals in its entirety.

JUSTICE BREYER, concurring in part and dissenting in part.

Words take on meaning from context. Considered in context, the preliminary injunction's language does not necessarily create the kind of "floating bubble" that leads the Court to find the injunction unconstitutionally broad. See Part II–C, *ante.* And until quite recently, no one thought that it did. The "floating bubble" controversy apparently arose during oral argument before the en banc Court of Appeals. The Court of Appeals then gave the District Judge, who has ongoing responsibility for administering the injunction, an initial opportunity to consider the petitioners' claim and, if necessary, to clarify or limit the relevant language. 67 F. 3d 377, 389, n. 4 (CA2 1995) (en banc). The Court of Appeals' response, in my view, is both legally proper and sensible. I therefore would affirm its judgment.

The preliminary injunction's key language prohibits demonstrating "within fifteen feet of any person or vehicle seeking access to or leaving such facilities." This language first appeared in the temporary restraining order (TRO), where it defined the precise scope of the order's prohibition against blocking "ingress into or egress from" facilities. That portion of the TRO enjoined the defendants from

> "trespassing on, sitting in, blocking, impeding or obstructing access to, ingress into or egress from any facility at which abortions are performed in the Western District of New York, including demonstrating *within*

*15 feet of any person seeking access to or leaving such facilities . . . ."* App. 23 (emphasis added).

Before the District Court issued the TRO, Reverend Schenck asked whether this language would create a floating bubble. The District Court replied:

"THE COURT: I don't think that was the intent. . . . [W]e're talking about . . . free access. . . . It's not a moving 15 feet.

"REV. SCHENCK: So in other words, you're speaking of the facility itself?

"THE COURT: I think that's what we were talking about . . . . We're talking fifteen feet from [*e. g.*, a doorway] to go right out to where ever you're going. . . . [M]y gosh, you would never be able . . . to deal with that if it was a moving length.

"It's fifteen feet from the entrance. . . . [Y]ou have to apply common sense . . . and [an interpretation of the language creating a moving zone] would not in any way at all be a fair interpretation of what we're talking about.

"REV. SCHENCK: Well, I'm glad you pointed that out . . . . [T]here is, I think, a very high degree of ambiguity . . . and no one . . . said what we're talking about here is 15 feet from an entranceway.

"THE COURT: I think everyone is clear on that now." App. to Reply Brief for Petitioners A–2 to A–3.

The identical key language (with the added words "or vehicle") then found its way into the preliminary injunction, issued 16 months later, where its presence apparently remained subject to the "no-float" understanding that the District Court had called "clear." The preliminary injunction simply separated the key language from the words that had immediately preceded it in the TRO (the "trespassing on, sitting in, blocking . . . ingress into or egress from" lan-

guage) and it added a phrase that more specifically described the fixed zone as

"fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances . . . ."

There is little reason to believe that the District Court, in relettering the paragraphs or inserting this new phrase, thereby intended to give the key language a significantly different meaning or a new purpose other than its original purpose of narrowing through specification the broader "blocking . . . ingress" language, now appearing a little earlier on in the injunction. The District Court's reference, in an accompanying opinion, to "dual 'clear zones' of fifteen feet around entrances and fifteen feet around people and vehicles seeking access," see *ante*, at 379, n. 10, by itself (and it is by itself) shows little, if anything, more than a "bubble" that surrounds an individual within or just beyond a fixed zone. In all other respects, given the presence of a new additional narrowing phrase—the phrase that speaks of, *e. g.*, "fifteen feet from either side"—the key language at issue here would simply have become redundant.

The District Court's and the parties' subsequent words and deeds suggest that the key language has had no significant independent injunctive life. The contempt motions and orders under the TRO, for example, refer to violations of a ᶠxed 15-foot zone from entrances (though in one instance, after counsel repeated the District Court's "no moving zone" clarification (quoted *supra*, at 396), Record, Doc. No. 232, pp. 276–279, the court found that a "totality" of the defendant's conduct, which involved serious obstruction within "10 to 20 feet" of an entrance, violated two provisions of the TRO including the key language. See *ante*, at 379, n. 10; Record, Doc. No. 263, pp. 6, 8). The contempt motions and orders, however, say nothing about violations of a bubble floating outside the fixed entrance zones—though the facts suggest

that the contemnors would have violated such floating zones had the TRO called them into existence. Nor is there anything in the many District Court filings in respect to the preliminary injunction that suggests an intent to create a floating bubble of the sort contemplated by this Court. The diagrams that plaintiffs submitted to clarify the injunction's scope contain no reference to a floating zone. Rather, they are marked to indicate 15-foot fixed buffer zones from entrances to clinic property. See Appendix B, *infra*.

In fact, at oral argument before the appeals court panel, counsel for the petitioners confirmed that the injunction's bubble did not "float" in the way contemplated by this Court. At that time an appeals court judge asked counsel (for the demonstrators) whether the 15-foot zone would apply after "someone leaves the abortion clinic and goes to a grocery store," perhaps "three miles away," and counsel replied as follows:

> "COUNSEL: I don't think that would [be] prohibit[ed] [by] the court's order. I think the court's order provides for a 15-foot setback or bubble zone around the clinic property . . . .
>
> "APPEALS COURT: Well, my question is to what extent can you . . . 'leave' and still be subject to this injunction?
>
> "COUNSEL: Maybe I just didn't see the full implications of the injunction, but I never considered that beyond the 15-foot bubble zone there would be this same restriction. Even I'm not arguing that the injunction goes that far. Maybe I just didn't see that but I didn't interpret it that way."

Not surprisingly, the appeals court's panel opinion did not mention floating bubbles. Nor did the parties mention the matter in subsequent District Court proceedings related to modifying or restoring the injunction—proceedings that took

place after the Court of Appeals' panel decision invalidating the injunction, but before the Court of Appeals heard the case en banc and reversed. At the latter time, apparently for the first time, the parties agreed that the injunction's language produced a zone that moved in some way or another.

Given this posture, it is not surprising that the en banc Court of Appeals did not deny the existence of a floating bubble zone, but left the initial resolution of the floating bubble controversy to the District Court. The Court of Appeals addressed the parties' argument regarding what the court termed a "floating buffer"—an issue that had never been raised before—by holding that the "floating buffer" was permissible, 67 F. 3d, at 389, on the assumption that the District Court would apply it in a constitutional manner, id., at 389, n. 4. Thus, the Court of Appeals did not definitively interpret the scope of the relevant language, but instead left it to the District Court to resolve in the first instance any linguistic ambiguity that might create a constitutional problem.

In my view, this action by the Court of Appeals was appropriate, and this Court should do the same. Appellate courts do not normally consider claims that have not been raised first in the District Court. Singleton v. Wulff, 428 U. S. 106, 120 (1976) (citing Hormel v. Helvering, 312 U. S. 552, 556 (1941)). There is no good reason to depart from this ordinary principle here. The District Court understands the history, and thus the meaning, of the language in context better than do we. If the petitioners show a need for interpretation or modification of the language, the District Court, which is directly familiar with the facts underlying the injunction, can respond quickly and flexibly. An appellate decision is not immediately necessary because the key language in the injunction has not yet created, nor does it threaten to create, any significant practical difficulty. No defendant in

this case has been threatened with contempt for violating the ostensible floating bubble provision. Nor is there any realistic reason to believe that the provision will deter the exercise of constitutionally protected speech rights.

I recognize that the District Court, interpreting or reinterpreting the key language, might find that it creates some kind of bubble that "floats," perhaps in the way I mention above. See *supra*, at 397. But even then, the constitutional validity of its interpretation would depend upon the specific interpretation that the court then gave and the potentially justifying facts. Some bubbles that "float" in time or space would seem to raise no constitutional difficulty. For example, a 15-foot buffer zone that is "fixed" in place around a doorway but that is activated only when a clinic patient is present can be said to "float" in time or, to a small degree, in space. See Appendix B, *infra*, Diagram 1 (Point X). Another example of a possibly constitutional "floating" bubble would be one that protects a patient who alights from a vehicle at the curbside in front of the Buffalo GYN Womenservices clinic and must cross the two-foot stretch of sidewalk that is outside the 15-foot fixed buffer. See Appendix B, *infra*, Diagram 2 (Point Y). Other bubbles, such as a bubble that follows a clinic patient to a grocery store three miles away, apparently are of no interest to anyone in this case. A floating bubble that follows a patient who is walking along the sidewalk just in front of a clinic, but outside the 15-foot fixed zone, could raise a constitutional problem. See Appendix B, *infra*, Diagram 3 (Point Z). But the constitutional validity of that kind of bubble should depend upon the particular clinic and the particular circumstances to which the District Court would point in justification. The Court of Appeals wisely recognized that these matters should be left in the first instance to the consideration of the District Court.

In sum, ordinary principles of judicial administration would permit the District Court to deal with the petitioners' current objection. These principles counsel against this

Court's now offering its own interpretation of the injunction—an interpretation that is not obvious from the language and that has never been considered by the District Court. I do not see how the Court's review of the key language, in the absence of special need and in violation of those principles, can make the lower courts' difficult, ongoing, circumstance-specific task any easier. To the contrary, district judges cannot assure in advance, without the benefit of argument by the parties, that the language of complex, fact-based injunctions is free of every ambiguity that later interpretation or misinterpretation finds possible. And I see no special need here for the Court to make an apparently general statement about the law of "floating bubbles," which later developments may show to have been unnecessary or unwise.

Hence, I join all but Part II–C of the Court's opinion. I would affirm the judgment of the Court of Appeals in its entirety.

### APPENDIX A TO OPINION OF BREYER, J.

### "TEMPORARY RESTRAINING ORDER

"Upon hearing . . . it is hereby

"ORDERED THAT Defendants, the officers, directors, agents, and representatives of defendants, and all other persons whomsoever, known or unknown, acting in their behalf or in concert with them, and receiving actual notice of this Order, are:

"1. Temporarily enjoined and restrained in any manner or by any means from:

"(a) trespassing on, sitting in, blocking, impeding or obstructing access to, ingress into or egress from any facility at which abortions are performed in the Western District of New York, *including demonstrating within 15 feet of any person seeking access to or leaving such facilities*, except that sidewalk counseling by no more than two persons as specified in paragraph (b) shall be allowed;

"(b) physically abusing or tortiously harassing persons entering or leaving, working at or using any services at any facility at which abortions are performed; Provided, however, that sidewalk counseling, consisting of a conversation of a nonthreatening nature by not more than two people with each person they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling and that if anyone who wants to, or who is sought to be counseled who wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event the persons seeking to counsel that person shall cease and desist from such counseling of that person. In addition, provided that this right to sidewalk counseling as defined herein shall not limit the right of the Police Department to maintain public order or reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site;

"(c) making any excessively loud sound which disturbs, injures, or endangers the health or safety of any patient or employee of a health care facility where abortions are performed in the Western District of New York, nor shall any person make such sounds which interferes with the rights of anyone not in violation of this Order; . . .

". . . and it is further

"ORDERED that nothing in this Order shall be construed to limit Project Rescue participants' exercise of their legitimate First Amendment rights . . . ." App. 22–26 (emphasis added).

## "PRELIMINARY INJUNCTION

"Upon consideration of the evidence introduced at a hearing . . . it is hereby

"ORDERED that defendants, the officers, directors, agents, and representatives of defendants, and all other persons whomsoever, known or unknown, acting in their behalf or in concert with them, and receiving actual or constructive notice of this Order, are:

"11. Enjoined and restrained in any manner or by any means from:

"(a) trespassing on, sitting in, blocking, impeding, or obstructing access to, ingress into or egress from any facility, including, but not limited to, the parking lots, parking lot entrances, driveways, and driveway entrances, at which abortions are performed in the Western District of New York;

"(b) demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities, or within fifteen feet of any person or vehicle seeking access to or leaving such facilities, except that the form of demonstrating known as sidewalk counseling by no more than two persons as specified in paragraph (c) shall be allowed;

"(c) physically abusing, grabbing, touching, pushing, shoving, or crowding persons entering or leaving, working at or using any services at any facility at which abortions are performed; provided, however, that sidewalk counseling consisting of a conversation of a non-threatening nature by not more than two people with each person or group of persons they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling, and that if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling, and shall thereafter be governed by the provisions of paragraph (b) pertaining to not demonstrating within fifteen feet of persons seeking access to or leaving a facility. In addition, it is further provided that this right to sidewalk counseling as defined herein shall not limit the right of the Police Department to maintain public order or

such reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site;

"(d) using any mechanical loudspeaker or sound amplification device or making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee of a health care facility at which abortions are performed, nor shall any person make such sounds which interfere with the rights of anyone not in violation of this Order;

". . . and it is further

"ORDERED that nothing in this Order shall be construed to limit defendants and those acting in concert with them from exercising their legitimate First Amendment rights . . . ." 799 F. Supp., at 1440–1441.

## APPENDIX B TO OPINION OF BREYER, J.
Diagram 1

**Point X**

Alexander Women's Group
220 Alexander Street, Ste. 300
Rochester, NY 14607
(part of Genesee Hospital Complex)

406

## APPENDIX B TO OPINION OF BREYER, J.
### Diagram 2

Buffalo GYN Womenservices
1241 Main Street
Buffalo, NY 14607

## APPENDIX B TO OPINION OF BREYER, J.
### Diagram 3

The Family Medicine Center
885 South Ave.
Rochester, NY 14620
(part of Highland Hospital complex)