BARRON, Circuit Judge, concurring in part and dissenting in part.
There is no more basic First Amendment principle than that the government may not restrain speech in advance of its expression simply because it may cause offense. We must be cautious, therefore, before we uphold an injunction, like the one before us, that bars the expression of certain specific statements due to the harm that they may cause. At the same time, there are few more basic principles of adjudication than that "if it is not necessary to decide more, it is necessary not to decide more." PDK Labs. Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring). In my view, the majority, by seeking to vindicate the first principle, gives insufficient attention to the second.
The result is that the majority strikes down this injunction by unnecessarily announcing a broad constitutional rule. Under that rule, it would appear that a lower court may not enjoin a recidivist defamer from using particular words, even when he has been properly found to have repeatedly used those same words in the past to defame the party that seeks the injunction and even when he has been found to be likely to do so again absent the injunction.
This result follows from the majority's decision to subject such an injunction to strict First Amendment scrutiny. The majority applies that demanding form of review because it treats such an injunction as a presumptively unconstitutional prior restraint. And the majority then strikes down this injunction under such scrutiny because it fails to require proof of actual *37 defamation in order to show its violation. See Maj. Op. at 30-35.[16]
In adopting this constitutional rule, the majority makes the following equation. It treats a specific, tailored means of stopping the recurrence of speech that the First Amendment does not protect as if it were a regulation designed to stop the initial expression of protected speech due to the offense that it may cause.
The decision to make this equation fits uncomfortably with our own circuit's precedent. It also conflicts with the only precedents that have decided the issue under the First Amendment. And, finally, it creates tension with Supreme Court rulings that afford lower courts significant discretion to enjoin parties from resuming their unprotected and unlawful expressive conduct.
The majority's rule also gives rise to significant practical concerns. We live in a world in which defamation campaigns may reach millions in an instant and essentially for free. Injunctions crafted in general terms to conform to the majority's rule risk inviting obstinate and proven defamers to resume their defamatory campaigns by wagering that their victims will lack the energy to enforce an injunction that requires them to prove actual defamation all over again.
In light of these concerns, I cannot sign on to the majority's rule, whatever its ultimate merits. And that is because, in my view, there is no need to announce it. The enjoined parties never timely made the debatable federal constitutional arguments on which the majority relies.
Nor can I sign on to the decision to vacate this injunction. The only other argument that the majority suggests could be a ground for vacating it, which challenges the District Court's finding that Sindi would suffer irreparable harm absent this injunction, see ids="9268537,3722653" index="403" url="https://cite.case.law/f3d/362/786/">id. at 35-36 n.15, also was not properly raised by the defendants either below or on appeal. And the arguments that the defendants did properly present to us in challenging the injunction lack merit.
For these reasons, although I fully join the majority's thorough and persuasive analysis in Parts I through VI of its opinion, I dissent from Part VII.
I.
To explain my concerns, I first review how this injunction came to be. I then describe the limited reach of the grounds for striking it down that the defendants timely made. Finally, I explain that this is not a case in which we should make an exception to our usual "raise-or-waive" requirement. Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995).
A.
The plaintiff, Hayat Sindi, came to federal court to seek relief from the defendants' five-year defamatory campaign. She *38 successfully made her defamation case to a jury, which awarded her a multi-million dollar verdict.
Nevertheless, Sindi was concerned that the defendants would not be deterred. She therefore sought a permanent injunction to prohibit them from making the statements that she alleged they had been making to defame her in the five years preceding her suit. Absent such an injunction, Sindi argued, she would suffer irreparable harm to her "reputation, business dealings, and emotional well-being" because the defendants would pick up where they had left off.
After hearing from the parties, the District Court issued a narrowed injunction that encompassed only six of the twenty-six statements that Sindi initially had sought to enjoin. In doing so, the District Court found that the defendants clearly had used the six statements to defame Sindi, resulting in irreparable harm to her, and that, absent the narrowed injunction, the defendants would likely continue to do so.[17]
Significantly, the defendants never made a peep-either below or in their opening and reply briefs on appeal-that indicated that they wanted to use the six statements in different contexts from those in which they had used them in the past. The defendants also did not meaningfully dispute-either below or on appeal-that they were likely to repeat the statements in that same way.[18]
Nor did the defendants argue that Sindi had failed to show that only an injunction, as opposed to a damages award, would be a sufficient remedy for any harm that she would suffer from the defendants' continuing to use the statements as they had. Rather, below, the defendants initially argued that she would not suffer such irreparable harm because their past communication of the statements had not actually harmed Sindi. And, on appeal, the defendants then abandoned even that limited challenge to the finding of irreparable harm that the District Court had ended up making.
The defendants did contend throughout this litigation that the proposed injunction violated the First Amendment. But, they did so by contending only that an injunction that barred the future expression of the six statements could not possibly be a valid prophylactic means of stopping their defamatory conduct going forward because: (1) the jury had returned a general verdict and thus did not expressly find that each of the statements encompassed by the injunction had been made in a defamatory manner in the past and (2) the evidence presented to the jury was, in any event, too weak to have permitted a jury to have so found.
The defendants thus never suggested at any point that strict scrutiny (or even *39 heightened review) applied to the injunction insofar as it was properly predicated on findings that the defendants had engaged in prior defamation through their use of those statements.[19] Nor did the defendants argue that such a properly predicated injunction would be an impermissible prior restraint under the First Amendment.
At oral argument on appeal, the defendants' counsel (who was not trial counsel) did attempt to argue for the first time, and despite the defendants' previous assertions to the contrary, the following: The injunction was a prior restraint that violated the First Amendment because it enjoined the defendants from repeating the six statements regardless of the context in which they might be communicated in the future. But, even then the defendants' counsel did not directly contend that strict scrutiny applied. And, when asked if the defendants had made that argument in their briefs on appeal, he conceded: "No, not the contextual argument."
Thus, based on the only two arguments that the defendants properly presented to us-namely, that the injunction encompassed statements that no jury had found to be defamatory and that, on the record established at trial, no adjudicator could so find-we have no reason to vacate this injunction. As Sindi persuasively shows, and the majority does not dispute, neither argument has merit.
The defendants do not adequately explain why the First Amendment bars the District Court from issuing this injunction simply due to the absence of a special verdict by the jury, given that the District Court supportably found that the defendants defamed Sindi in the past with each of the six enjoined statements and that the defendants would likely continue to do so.[20] The defendants also fail to show that the record cannot support the District Court's finding that the defendants had used each enjoined statement to defame Sindi.
B.
Nonetheless, the majority does vacate the injunction. It does so by relying on a ground that the defendants did not properly raise either below or on appeal: that this injunction is a presumptively unconstitutional prior restraint that is subject to strict scrutiny, which it flunks because it enjoins particular statements regardless of the context in which they are used. See Maj. Op. at 30-35.
The majority acknowledges that its decision to rely on this defaulted argument is most unusual. See id. at 27-28. Under our "raise-or-waive" rule, which we ordinarily apply with "a near-religious fervor," the defendants would have to "forever ... hold their peace" with respect to that argument. Nat'l Ass'n of Soc. Workers, 69 F.3d at 627 (failure to raise below); accord United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (failure to raise on appeal).
*40 And, the majority recognizes, see Maj. Op. at 27-28, there is good reason to enforce that "raise-or-waive" requirement strictly, as it serves important "systemic ends," Nat'l Ass'n of Soc. Workers, 69 F.3d at 627, by incentivizing parties to make arguments in a timely way and by ensuring that like cases are treated alike.
The majority nevertheless suggests that because this case involves a regulation of speech crafted by a federal court, there is reason to relax our usual "raise-or-waive" rule. See Maj. Op. at 28-29. But, the majority does not rule that the District Court lacks equitable jurisdiction to impose this remedy. See id. at 35. And I see no reason to encourage parties to assume that, in general, they need not be as diligent in pressing their personal constitutional rights in challenging court-crafted injunctions as we routinely require criminal defendants to be in challenging court-crafted sentences.[21]
Moreover, to the extent that the majority is inclined to relax our "raise-or-waive" rule in this case, I certainly see no reason to reach the prior restraint/strict scrutiny issue. The majority itself suggests that the injunction could be independently invalidated on the far narrower ground that the record does not support the District Court's finding that the injunction is necessary to protect Sindi from irreparable harm. See id. at 35-36 n.15.
To be sure, that argument, too, was defaulted by the defendants. But, by resting its vacatur solely on the irreparable harm argument, the majority at least would be issuing a relatively narrow, record-dependent ruling, with no broad federal constitutional implications.[22]
Nor am I persuaded by the majority's conclusion that it makes sense to decide this case on the basis of the forfeited constitutional argument in light of our precedent recognizing that " 'an appellate court has discretion, in an exceptional case, to *41 reach virgin issues,' that is, to relieve a party of a prior forfeiture." Chestnut v. City of Lowell, 305 F.3d 18, 21 (1st Cir. 2002) (en banc) (per curiam) (quoting United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir. 1990) ). Under this exception to the "raise-or-waive" rule, we may exercise discretion to decide a case based on a forfeited argument after considering a variety of factors, such as whether the underlying issue is of "constitutional magnitude" and "great public moment"; the party's failure to address it was "entirely inadvertent rather than deliberate"; its proper resolution is sufficiently clear that the lower court can be said to have plainly erred; and deciding it will not result in "special prejudice or inequity" to the non-defaulting party or "deprive[ ] the court of appeals of useful factfinding." Nat'l Ass'n of Soc. Workers, 69 F.3d at 627-28 ; accord Chestnut, 305 F.3d at 21.
Here, of course, we are dealing with a failure to properly raise an argument in appellate briefing as well as in the district court. But, insofar as the exception to our "raise-or-waive" rule on which the majority relies applies to such a situation,[23] I cannot see why it applies here. The prior restraint/strict scrutiny issue is of "constitutional magnitude" and, at least arguably, of "great public moment."[24] But, the other factors that we have held bear on deciding whether to excuse a forfeiture weigh against doing so.
To begin with, it would be extremely generous to characterize as "entirely inadvertent," Nat'l Ass'n of Soc. Workers, 69 F.3d at 628 (emphasis added), the defendants' years-long strategy of training their fire solely on the supposedly inadequate predicate finding that the defendants used the six enjoined statements to defame Sindi in the past. Indeed, at the hearing on the proposed injunction, the District Court, quite conscientiously, sought to make sure that the defendants' federal constitutional challenge to Sindi's proposed injunction was as limited as it appeared to be. And, in response, the defendants' counsel made clear that it was: "I think there would not be a prior restraint, your Honor, if there had been a final adjudication as to certain statements" finding that they were defamatory. That counsel also confirmed that same position repeatedly at that same *42 hearing. And he did so without ever suggesting that the injunction, as drafted, might be unconstitutional under the First Amendment if it were properly predicated.
Consistent with those representations, moreover, the defendants also declined the District Court's express invitation to suggest that "the language [of the injunction] should be tweaked one way or another to not create a prior restraint." And that was the case even though the District Court soon thereafter had, prudently, circulated for comment a narrowed version of the proposed injunction that targeted just six of the twenty-six statements that Sindi initially had sought to enjoin.
It also seems to me that prejudice does result from our willingness to revive this never-before-raised constitutional argument. The parties were given a chance to provide supplemental briefing to address it. But, we have never suggested that the provision of that opportunity is a panacea. And here it is not.
If the defendants had given Sindi some indication below that they actually wished to use the enjoined statements in new contexts, she potentially could have further developed the record regarding just how the defendants did intend to use those statements and why the injunction-in whatever form it would then take in such circumstances-was necessary to prevent the defendants from nevertheless using the statements to defame her. Had that happened, the District Court could have then evaluated that more developed record and either scaled back the injunction in some calibrated manner that might still protect Sindi or issued this same injunction after making findings on the key disputed points concerning the defendants' likely future conduct.
What the case then would have looked like we cannot know, precisely because we are raising these constitutional issues on our own and are thus deprived of that "useful factfinding." Id. at 627. But, we are not the only ones who lose out by short-circuiting this normal adjudicative process. Because we have transformed what had been a concrete dispute into an abstract one, Sindi finds herself stripped altogether of the protection that she had secured. And she is stripped of it based on a speculative expressive interest that we have assumed the defendants must have, even though the defendants themselves never gave her (or the enjoining court) any indication that they actually do.[25]
Perhaps the fact that we are deciding this case in this artificial posture does not matter. Perhaps, under the majority's rule, there is no showing that Sindi could make about her proven defamers' likely future conduct that would entitle her to an injunction of this kind. Perhaps, in fact, she would not be able to make such a showing even if the defendants had been found to have been in violation of an earlier injunction that did require Sindi to prove defamation to enforce it.
But, if, as appears, that is what the majority means to hold, then, in my view, it is especially clear that we have no good reason to make an exception to our "raise-or-waive" rule here. For, as I will next explain, such a broad federal constitutional holding hardly rests on a legal conclusion that is so plainly right that it is of the kind *43 that "often inclines a court to entertain a pivotal argument for the first time on appeal." Id. at 628 (quoting La Guardia, 902 F.2d at 1013 ).
C.
As the majority recognizes, there is no on-point precedent-from either our court or the Supreme Court-that dictates the federal constitutional rule that it announces. See Maj. Op. at 30. Of course, the absence of such precedent is not conclusive as to whether the rule that the majority adopts is so plainly right that the party that would benefit from its announcement may be excused for having failed to raise the issue properly.
But, here, the problem with finding the law so clear that no argument about it need be timely raised is more fundamental. For, in this case, there is not merely a dearth of controlling supportive precedent, but also substantial (though not controlling) opposing precedent and not a single case of any court that actually holds what the majority now does.
1.
To begin, as the majority acknowledges, there is no controlling Supreme Court precedent that makes clear what the majority holds: that an injunction that bars the expression of certain statements is a presumptively unconstitutional prior restraint under the First Amendment even when it rests on findings that the enjoined party had engaged in prior unprotected, unlawful uses of the enjoined statements and will likely use those statements in that same unprotected and unlawful manner going forward absent the injunction. And the fact that there is no such precedent should give us pause.
This injunction-like any that bars a party from making any statement-does preclude expression before it is expressed. But, we have no reason to conclude that the absence of Supreme Court precedent treating an injunction like this one as a presumptively unconstitutional prior restraint should be chalked up to the fact that the Court simply has not yet gotten around to doing so, because, once it does, the result will be obvious. To the contrary, the Supreme Court has expressly cautioned that "[t]he phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." Kingsley Books, Inc. v. Brown, 354 U.S. 436, 441, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) ; see also Madsen, 512 U.S. at 764 n.2, 114 S.Ct. 2516 (explaining that "[n]ot all injunctions that may incidentally affect expression ... are 'prior restraints' in the sense that that term was used in New York Times Co. [v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam) ]").[26]
*44 Our own precedent, moreover, has been sensitive to this guidance. That precedent involved a statute that authorized injunctive relief to be ordered on the basis of a finding that a defendant had engaged in unprotected charitable solicitation. See Auburn Police Union v. Carpenter, 8 F.3d 886, 902 (1st Cir. 1993). And we explained there that "[a]n injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint." Id. at 903.
Further, a number of courts, including the Sixth Circuit and the California Supreme Court, have actually approved, in the face of First Amendment challenges, injunctions just like this one. See, e.g., Lothschuetz v. Carpenter, 898 F.2d 1200, 1208-09 (6th Cir. 1990) (Wellford, J., for the court in part); Balboa Island Vill. Inn, Inc. v. Lemen, 40 Cal.4th 1141, 57 Cal.Rptr.3d 320, 156 P.3d 339, 342-53 (2007) ; cf. McCarthy v. Fuller, 810 F.3d 456, 462 (7th Cir. 2015) (observing that "[m]ost courts would agree" with the Sixth Circuit on this issue).[27] And no precedent, so far as I am aware, has struck a similar one down under the First Amendment.[28]
The majority does rely on one Supreme Court precedent that invalidated an injunction that was a remedy for past defamation: Tory, 544 U.S. 734, 125 S.Ct. 2108, 161 L.Ed.2d 1042. See Maj. Op. at 31-32. But, the Court held there that the injunction was an "overly broad prior restraint" only because the defamation victim died while the case was pending before the Court. Tory, 544 U.S. at 738, 125 S.Ct. 2108. The Court then explained that, in consequence of the defamation victim's death, even though the case was "not moot," it was both "unnecessary" and "unwarranted" to further "explore" the enjoined parties' claims there, including the claim that "the injunction (considered prior to [the defamation victim's] death) was not properly tailored and consequently violated the First Amendment." Id. at 736-38, 125 S.Ct. 2108 ; see also Carroll, 393 U.S. at 180, 89 S.Ct. 347 (noting that the Court need not decide the "thorny" problem of whether an injunction against a white supremacist organization's rally could be justified based on findings that the organization had engaged in unprotected conduct *45 at a prior rally because the injunction could be invalidated on the narrower ground that it was issued ex parte without notice or an opportunity to be heard).[29]
2.
This body of precedent suggests to me that, at the very least, there is good reason to tread cautiously in the face of the defaulted prior restraint/strict scrutiny argument, just as the Court chose to do in Tory itself. The majority may be right that the courts that have upheld injunctions as prophylactic means of preventing the likely recurrence of defamation, like the one before us, have been wrong to rely on the Kingsley Books line of Supreme Court precedent. See, e.g., Balboa Island, 57 Cal.Rptr.3d 320, 156 P.3d at 346-47. That line of precedent may be distinguishable due to defamation's more "mutable" nature. See Maj. Op. at 33. But, the briefing in Tory indicates that we also need to address a different line of precedent, which cannot be similarly distinguished.
Specifically, the Tory briefing points to Madsen and Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), each of which remains good law. Those cases upheld portions of injunctions, a permanent one in Madsen and a preliminary one in Schenck, that restricted defendants from "demonstrating" on public rights of way within fixed buffer zones outside abortion clinics-activity that was, of course, otherwise constitutionally protected. Schenck, 519 U.S. at 380-85, 117 S.Ct. 855 ; Madsen, 512 U.S. at 768-71, 114 S.Ct. 2516.
The Court reasoned that those portions of the injunctions survived First Amendment review because they "burden no more speech than necessary to serve a significant government interest." Schenck, 519 U.S. at 372, 117 S.Ct. 855 (quoting Madsen, 512 U.S. at 765, 114 S.Ct. 2516 (citing Carroll, 393 U.S. at 183-84, 89 S.Ct. 347 ) ). Thus, neither case required the application of strict scrutiny, which demands that a regulation of expression be "the least restrictive means of achieving a compelling state interest." McCullen, 134 S.Ct. at 2530.
The Court held that this less exacting form of review applied, moreover, even though the injunctions "restrict[ed] only the speech of antiabortion protesters." Madsen, 512 U.S. at 762, 114 S.Ct. 2516. And the Court explained that this less demanding form of scrutiny applied because each injunction, in relevant part, issued "not because of the content of [the protesters'] expression, ... but because of their prior unlawful conduct." Schenck, 519 U.S. at 374 n.6, 117 S.Ct. 855 (quoting Madsen, 512 U.S. at 764 n.2, 114 S.Ct. 2516 ) (alteration and omission in original). The Court then went on to explain that those injunctions, in relevant part, survived that review because of the issuing court's supportable findings that the enjoined parties would likely continue to engage in that same conduct absent the injunction, id. at 380-82, 117 S.Ct. 855 ; Madsen, 512 U.S. at 769-70, 114 S.Ct. 2516, which had involved impeding access to the clinics and harassing those clinics' patients in violation of, respectively, a prior injunction in Madsen and state law in *46 Schenck. Schenck, 519 U.S. at 375, 117 S.Ct. 855 ; Madsen, 512 U.S. at 763, 114 S.Ct. 2516.[30]
The Court in Schenck neatly described the underlying logic for permitting courts to impose such speech-restrictive prophylactic injunctive relief in rejecting the argument that the injunction must be struck down because "a ban on 'demonstrating' within the fixed buffer zone is 'a ban on peaceful, nonobstructive demonstrations on public sidewalks or rights of way' ":
This argument ... ignores the record in this case. Based on defendants' past conduct, the District Court was entitled to conclude that some of the defendants who were allowed within [a certain distance] of clinic entrances would not merely engage in stationary, nonobstructive demonstrations but would continue to do what they had done before: aggressively follow and crowd individuals right up to the clinic door and then refuse to move, or purposefully mill around parking lot entrances in an effort to impede or block the progress of cars.
519 U.S. at 381-82, 117 S.Ct. 855 (emphasis added).
The injunction here is no different. It, too, was imposed as a prophylactic means of ensuring that proven unprotected and unlawful expression would not be repeated. And it, too, rests on unchallenged findings that the enjoined parties likely would continue to do what they had been doing absent the injunction.
The majority nevertheless attempts to distinguish Madsen and Schenck on the ground that this particular injunction is content-based and so for that reason must be subjected to strict constitutional review. See Maj. Op. at 34-35; Reed v. Town of Gilbert, Ariz., --- U.S. ----, 135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015) ; Near v. Minnesota ex rel. Olson, 283 U.S. 697, 713, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). But, strict scrutiny would ordinarily apply to a speech regulation that, like the ones in Madsen and Schenck, "covered people with a particular viewpoint," Madsen, 512 U.S. at 763, 114 S.Ct. 2516, and yet the Court did not apply strict scrutiny in either of those cases.
The Court nicely laid out the reason why in Madsen. In rejecting the argument that the injunction there was "necessarily content or viewpoint based" simply because the face of it restricted "only the speech of antiabortion protesters," the Court explained:
To accept [that] claim would be to classify virtually every injunction as content or viewpoint based. An injunction, by its very nature, applies only to a particular *47 group (or individuals) and regulates the activities, and perhaps the speech, of that group. It does so, however, because of the group's past actions in the context of a specific dispute between real parties. The parties seeking the injunction assert a violation of their rights; the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public.
Id. at 762, 114 S.Ct. 2516 (emphasis added).
That same reasoning suggests to me that it is hardly clear that this injunction is subject to strict scrutiny just because it targets specific statements. The District Court included the six statements in the injunction for the entirely content-neutral reason that the record showed with unusual clarity that the defendants had used these particular statements to defame Sindi in the past and that they would likely use them to do so again. Accordingly, there is no reason to think that the District Court singled out these statements for any reason other than the content-neutral one for which the lower courts permissibly singled out certain abortion protesters in issuing the injunctions in Madsen and Schenck-namely, to ensure that the enjoined parties would not continue unlawfully to harass their targets through the resumption of unprotected expressive activity.
For this reason, Snyder v. Phelps, 562 U.S. 443, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011), does not show-let alone clearly-that Madsen and Schenck are beside the point. See Maj. Op. at 35. In Snyder, the Court distinguished Madsen on the ground that, in Snyder, a state had imposed tort liability for prior protected speech because of both "the content and viewpoint of the message conveyed" and not as a prophylactic check against the recurrence of prior unprotected speech. 562 U.S. at 457-58, 131 S.Ct. 1207. Thus, by treating this case as if it is the same as Snyder, the majority, in my view, makes the basic mistake that generally underlies its analysis: It equates an injunction that has been crafted as a prophylactic means of stopping the likely recurrence of speech that has already been found to have been expressed in an unprotected manner with a regulation to restrict the expression of offensive but protected speech from ever being uttered at all.
3.
Turning to the issue of whether this injunction is sufficiently narrowly tailored, I do not deny that, as written, it precludes statements that can be expressed in ways that would be protected. And, I cannot deny that, notwithstanding what the undisputed record shows, the defendants may at some point choose to use the enjoined statements for some reason other than to continue their defamatory campaign against Sindi.
But, the defendants would not then be forced to choose between contempt and silence. If, as the majority speculates, Maj. Op. at 34, they happen to have a surprising change of heart that leads them to want to, say, apologize to Sindi by renouncing-by means of repeating-their prior statements, they would need only to call upon the District Court's unquestioned responsibility to modify the injunction. See Balboa Island, 57 Cal.Rptr.3d 320, 156 P.3d at 353 & n.13.
I recognize-as the majority rightly notes-that a regulation of speech ordinarily may not be justified on the ground that it permits restricted speakers to obtain a court's permission to speak. See Maj. Op. at 34-35. But, as Madsen and Schenck recognized, cases like the one before us arise in the wake of a party's having engaged in prior unprotected conduct.
*48 And, in cases of that type, per Madsen and Schenck, lower courts have been afforded room to craft particularized, prophylactic injunctions to prevent the recurrence of irreparable harm based on supportable findings that the parties to be enjoined will resume their prior pattern of unprotected, unlawful conduct absent the injunction.
All of that said, I do not dispute that this injunction could be more narrowly drawn-just as the ones at issue in Madsen and Schenck also could have been. It could, for example, have included a coda that enjoined the listed statements only insofar as the defendants use them to defame Sindi, just as each of the injunctions in Madsen and Schenck could have included a coda that limited the protesters' presence in the buffer zone only to the extent that they behaved in an unprotected manner.[31]
But, such a coda comes at the expense of the specificity and clarity of the prohibition and thus at the ease of its enforcement. And because such codas invite enjoined parties to press their luck, a constitutional requirement to impose one amounts to a constitutional requirement that victims of unlawful campaigns of defamation-such as Sindi-tolerate a greater risk of suffering irreparable harm.
There is no clear precedent, however, that requires proven defamation victims to bear that risk. In fact, Madsen permitted the imposition of a prophylactic ban on some otherwise protected demonstrating in part because a more tailored prior injunction banning "blocking or interfering with public access to the clinic, and from physically abusing persons entering or leaving the clinic" had "proved insufficient." 512 U.S. at 758-59, 114 S.Ct. 2516. And Schenck then clarified that a court may proceed with imposing "a 'speech-restrictive' injunction" that is found necessary to avoid irreparable harm "without first trying a 'non-speech restrictive' injunction." 519 U.S. at 382, 117 S.Ct. 855.
II.
The majority's First Amendment ruling limits a defamation victim's right to secure protection from the harm that her obstinate defamers are likely to inflict. But, this ruling may have even broader implications, as I do not see why its logic applies only to remedies for defamation. See, e.g., Aguilar v. Avis Rent A Car Sys., Inc., 21 Cal.4th 121, 87 Cal.Rptr.2d 132, 980 P.2d 846, 853-59 (1999) (holding that enjoining a defendant's use of racial epithets at the defendant's workplace was not an unconstitutional prior restraint because it was based "on [his] continuing course of repetitive conduct" that violated employment discrimination law).
By discussing the merits of this ruling at length, however, I do not mean to resolve the underlying constitutional issues. I *49 mean only to explain my disagreement with the majority's assertion that its conclusions are so firmly rooted in basic First Amendment principles and precedents that we have good reason to depart from our usual "raise-or-waive" rule. Nor do I see any reason for the majority to address these debatable and defaulted First Amendment arguments when the majority suggests that the much less consequential, albeit still defaulted, argument that the record did not show that an injunction was necessary to prevent irreparable harm could on its own suffice to justify the invalidation of the injunction.
The majority itself counsels that "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures." Maj. Op. at 30 (quoting Privitera v. Curran (In re Curran ), 855 F.3d 19, 22 (1st Cir. 2017) ). That counsel commands special attention, it seems to me, when its disregard risks causing irreparable harm to a proven victim of a years-long defamation campaign for reasons first brought to her attention-if even then-only at oral argument in our court.
For these reasons, I respectfully dissent from Part VII, while otherwise fully joining the majority's excellent analysis.
APPENDIX A *50 EXHIBIT A
Sindi v. El-Moslimany, et al Case No. 1:13-cv-10798-IT Page No. 1
Plaintiff's Alleged Defamatory Statements
Exhibit 29 (April 20, 2012 email from Samia El-Moslimany to Mr. Eba at camp-online.org)
• Page One:
• I am just one victim of Hayat Sindi's manipulations
• Page Two:
• Dr. Sindi has misrepresented by herself and her accomplishments as a Muslim and professional;
• In addition, her personal, professional and academic resume is fraught with untruths and exaggeration, calling into question her credentials as a scholar and a professional.
• What might seem as trivial dishonesty or vanity about her age, has given her opportunities that should have gone to those who actually fit the `youth' criteria for specific awards.
• By misrepresenting her age, Sindi robbed opportunities for recognition, public relations support, funding opportunities and career advancement, from the very youth she proclaims to support with her new institute, http://i2institute.org.
• ... professionally, Sindi promotes herself as `one of the world's leading biotechnologists'.
Exhibit 44 (December 22, 2012 email from Ann El-Moslimany to Joi Ito)
• Page One:
• I have done extensive research on Hayat Sindi, finding her personal, professional and academic resume is fraught with complete untruths and exaggeration, calling into question her credentials as a scholar and a professional
• Currently her problematic background is coming under scrutiny from both Middle East and international media outlets.
• ... several board members of the i2 Institute [] have launched their own proactive investigations after my contact with them.
• ... Sindi had little, if no participation, in her most publicly touted achievement - the actual scientific development and invention of the diagnostic tool developed in the Harvard lab of Professor George Whitesides and the founding of the company, Diagnostics For All. It is for this invention which was not hers, that Sindi was awarded the National Geographic Emerging Scholar Award, the PopTech Innovation Fellowship, and was honored with a UNESCO Ambassadorship
• Page Two:
• Imagine when Saudi youth discover that their hero(ine) is a fraud ...
• Page Two/"Hayat Sindi in Brief"
• False and Exaggerated Academic and Professional Accomplishments Resulting in Undeserved Accolades *51 • PhD research conducted and dissertation allegedly written by Dr. Adrian Stevenson ... while under the advisorship of Professor Christopher Lowe, at Cambridge University.
• Although given the title of Harvard Visiting Scholar with Professor George Whitesides ... Sindi did not teach, do any research of substance, work in the laboratory, or pursue a degree or post doctoral at Harvard
• Does not have an MBA from Harvard as stated in numerous media articles;
• No record of having studied at Oxford;
• Page Three/"Hayat Sindi in Brief"
• Falsification of her age by 11 years;
• By misrepresenting her age, Sindi robbed opportunities for recognition, public relations support, funding opportunities and career advancement, from the very youth she claims to support with her new institute, http://i2institute.org;
• she claimed to be 16
• she claimed to be 29
• she claimed to be 31
• she claimed to be 32
• Fraudulent claims of inventions
• Page Four/"Hayat Sindi in Brief"
• Promotes self as one of the world's top biotechnologists;
• Sonoptix is housed in an apparently empty store front in Cambridge;
• Page Five/"Hayat Sindi in Brief"
• Sindi brought a frivolous lawsuit against American Samia El-Moslimany
Exhibit 50 (January 18, 2013 Washington Post article - David Ignatius: Women gain newfound stature in Saudi Arabia, including comments)
• Page 000020 (comment by "Her fiance's wife")
• Sindi's ever changing pathologically altered life story
• She has been lying about her age since 1999, successfully snatching honors and awards for young scholars when she was in her 40's
• ... her non-existent role in the founding of DFA
• my family and I are left homeless and penniless....
Exhibit 51 (January 30, 2013 Amazon Review)
• Page 3
• Hayat Sindi's personal, professional and academic resume is fraught with exaggeration, and calls into question her credentials as a scientist, a scholar and a professional, and certainly as a role model for young people;
• Nearly every page of this book about Sindi is filled with her now famous inaccuracies and exaggerations about her past, her claiming of discoveries that are not her own, as well as the accolades she received she received as a result of her fabrications;
*52 • If Sindi has made any scientific discoveries, none of them have been produced or are helping cancer patients;
• ... Sindi had little, if no participation, in her most publicly touted achievement the actual scientific development and invention of the diagnostic tool developed in the Harvard lab of Professor George Whitesides and the founding of the company, Diagnostics for All.
• It was primarily for this invention, which was not hers alone to claim, that Sindi was awarded the National Geographic Emerging Scholar Award, and was also honored with a Pop Tech Innovation Fellowship, and just recently made a UNESCO Ambassador
• By lying about her age, Sindi robbed opportunities for recognition, public relations support, funding opportunities and career advancement, from the very Saudi and Muslim youth she proclaims to support
• In 1991, when Sindi arrived in the UK, she was 24 years old (she claims to have come at 15 or 16 years of age) and had already attended medical school at King Abdul Aziz University for at least two years, where the medium of instruction is English
• She certainly spoke English when she arrived in the UK with her father who arranged for her to stay in a rooming house of a well-respected Muslim teacher, Yusuf Qardawi
• Dr. Lowe accepted Sindi as a doctoral candidate, even though she did not have the prerequisite knowledge to become a candidate in biotechnology;
• [she received her PhD from Cambridge], for which her PhD adviser, Dr. Lowe, says she did not deserve, as the research and dissertation appeared to be carried out by one of her colleagues another postdoctoral student
• Sindi continues to claim ownership of the MARS invention;
• Sindi never produced a process to make sewage water clean enough to drink, and if such a process exists and is helping `poor communities' Sindi played no part
• Sindi appears to have ... two patents, one of which was based on her potentially plagiarized PhD research ....; and
• Sindi was part of a team of 6 and did not head the team that won the MIT Entrepreneurship Competition, the team was mentored and headed by Harvard Business School Professor Vicki Sato.
Exhibit 52 (January 29, 2013 email between Samia El-Moslimany and David Ignatius of the Washington Post)
• Page One:
• ... [Sindi] has a history of lying, repeatedly contradicting herself, and making completely false statements to the media;
• Page Two:
• Tens of thousands of people surely read the article when first published, and deserve to know there are glaring omissions and in fact were recounted exaggerations, if not outright lies;
*53 • Sindi fraudulently was awarded PhD. According to people intimately involved with her personally and academically, Sindi did not carry out the research nor author the PhD dissertation for which she was awarded a Cambridge Doctorate;
• She launched an unsuccessful company, Sonoptix circa 2003, which died a quick death by 2004;
• She was originally allowed to call herself a Co-founder of DFA for the purposes of bringing in funding, at which she utterly failed. She had no substantive part in the creation of the company, other than as a member of the six person business plan team, and as a facilitator in getting Berlow and Carmichael to do the serious business establishment legwork
• Yes, she's launched the i2 institute. One board member, the original only other woman on her board, has quietly resigned. A newly added board member has confided they will resign, and another member has retained a private investigator to retroactively check into Sindi's background and has been questioning me. One supporting `partner' indirectly contacted people close to me and is seriously considering their association with her tainted organization.
• ... her biggest financial backers are involved in an investigation of her fraudulent background and misuse of funds, stemming back to her Cambridge days;
• con-artist Sindi;
• The problem is that Sindi's `accomplishments' are simply her fabricated story, or honors bestowed upon her by those who believed her story;
• Her PhD: Ghost researched, ghost written; and
• Harvard Visiting Scholar: Never taught or did substantive research ... [t]he title was bestowed upon her so she could retain a visa to the US and go back to brandishing her Harvard association to raise funds for DFA and Nano Terra.
• Page Three
• ... funding for Sonoptix dried up because the technology failed;
• Awarded the MIT Arab-American Science and Technology Young Professional Award, a Pop Tech Fellowship, the National Geographic Emerging Scholar Award, UNESCO Ambassadorship and an array of empty Arab achievement awards: You bet, based on her lies about her age and on the same fabricated story of determined accomplishments that she shared with you.
• When she arrived in the UK to restart her undergrad degree, she had completed at least two years of medical school at King Abdul Aziz University in Jeddah where the medium of instruction is English. She spoke English.
Exhibit 66 (February 12, 2014 email to "a number of US State Department employees, the and the US Consul General in Jeddah)
• Page One:
• Hayat Sindi has brought me to the verge of financial collapse by a frivolous $10,000,000 lawsuit she, and the i2 Institute she heads, have brought against me in Boston; and
• Hayat Sindi is an academic and scientific fraud.
*54 • Page Two:
• Currently of greatest concern is the apparent use of i2 Institute funds by Hayat Sindi and the i2 Institute Board of Directors in bringing another frivolous lawsuit against the very Arab youth that she purports to mentor;
• Currently her problematic background is coming under scrutiny from both Middle East and international social media. Several board members of the i2 Institute who have launched their own proactive investigations, prudently removed themselves from the i2 Institute Board, fearing that they would become associated with the scandal of fraud that is being revealed.;
• Imagine when Arab youth discovery that their heroine is a fraud ...; and
• Page Three/"Hayat Sindi in Brief"
• False and exaggerated Academic and Professional Accomplishments Resulting in Undeserved Accolades and Appointments;
• Cambridge PhD research and dissertation not by Sindi;
• According to Professor Christopher Lowe, Sindi's PhD supervisor at Cambridge, he was very reluctant to accept Sindi into the Cambridge Biotechnology PhD program, because of her lack of prerequisite knowledge;
• Suspicion of Academic Fraud by Hayat Sindi; Her PhD research was allegedly conducted and her dissertation written, by Adrian Stevenson, a postdoctoral and very intimate friend of Sindi
• Lowe claimed that the writing style of her dissertation was clearly that of Stevenson, and that they were `very, very intimate friends';
• Lowe believes that `money definitely changed hands';
• Myer Berlow of NanoTerra also confirmed that she did not have the basic scientific or technical knowledge to have conducted the research or to have written her dissertation;
• According to Myer Berlow and others closely associated with her, Sindi did not, in a substantive way, teach, take part in research, work in the laboratory, or pursue a degree or post doctorate at Harvard;
• Falsification of age;
• Sindi began publicly lying about her age from 1999, sometimes as much as eleven years;
• By continually misrepresenting her age, Sindi robbed opportunities for recognition, public relations support, funding opportunities and career advancement, from the very youth she proclaims to support with her new institute;
• she claimed to be 16;
• Page Four/"Hayat Sindi in Brief"
• she claimed to be in her twenties;
• she claimed to be 29;
• she claimed to be 31;
• she claimed to be 32;
• Fraudulent Claims of Inventions and Patents;
*55 • Sindi did not in a substantive way participate in the actual invention of the postage stamp-sized medical diagnostic tool developed in the lab of Professor George Whitesides at Harvard;
• It was for this invention, the invention in which she did not substantively participate, that she was exclusively honored and awarded by both Poptech and National Geographic; and
• Sindi fraudulently has claimed to have `invented' MARS, a medical diagnostic sensor, and claimed her UK-based dormant company Sonoptix, produced the sensor
• Page Five/"Hayat Sindi in Brief"
• Sindi promotes herself as one of the world's top biotechnologists.
• Sindi appears to have her name on 2 possibly 3 patents. One patent is based on her PhD research allegedly carried out by her close friend Adrian Stevenson, also allegedly compensated ...; and
• Sonoptix is housed in an apparently empty storefront in Cambridge;
• Purportedly Sindi was brought onboard [at Nano Terra] to raise funds for the company from Saudi Arabia, and was entirely unsuccessful;
• Page Six/"Hayat Sindi in Brief"
• Appointment to UNESCO based in large part on a recommendation from Adrian Stevenson, the very close friend and alleged compensated author of her PhD dissertation
Exhibit 67 (February 12, 2014 email from "Abdullah Alhaq" to "i2 Institute Board Members and Members of the Media")
• Page Two
• Hayat Sindi's personal, professional and academic resume is fraught with complete untruths and exaggerations. Her PhD supervisor at Cambridge, her colleagues at Harvard, and many, many others attest to this. Please see (Hayat Sindi in Brief) below.
• Currently of greatest concern is the apparent use of i2 Institute donated funds by Hayat Sindi and the i2 Institute Board of Directors in bringing a frivolous lawsuit against the very Arab youth that they claim to mentor
• her problematic background is coming under scrutiny from other Middle East and international media. Several former board members of the i2 Institute began their own proactive investigations, which resulting in individuals removing themselves from the i2 Institute Board, fearing that they would be associated with the scandal of deception that is being revealed;
• Imagine when Arab youth discover that their heroine is a fraud....;
• Hayat Sindi is an illusion perpetuated by the West - Cambridge, Harvard, National Geographic, the UN.
• In addition, it is important to know we have personally interviewed everyone mentioned below and we are ready to refer you directly to sources of the information that prove her qualifications are fictional;
*56 • Page Two through Three/"Hayat Sindi in Brief"
• False and exaggerated Academic and Professional Accomplishments Resulting in Undeserved Accolades and Appointments;
• Cambridge PhD research and dissertation not by Sindi;
• According to Professor Christopher Lowe, Sindi's PhD supervisor at Cambridge, he was very reluctant to accept Sindi into the Cambridge Biotechnology PhD program, because of her lack of prerequisite knowledge;
• Suspicion of Academic Fraud by Hayat Sindi; Her PhD research was allegedly conducted and her dissertation written, by Adrian Stevenson, a postdoctoral and very intimate friend of Sindi
• Lowe claimed that the writing style of her dissertation was clearly that of Stevenson, and that they were `very, very intimate friends';
• Lowe believes that `money definitely changed hands';
• Myer Berlow of NanoTerra also confirmed that she did not have the basic scientific or technical knowledge to have conducted the research or to have written her dissertation;
• According to Myer Berlow and others closely associated with her, Sindi did not, in a substantive way, teach, take part in research, work in the laboratory, or pursue a degree or post doctorate at Harvard;
• Falsification of age;
• Sindi began publicly lying about her age from 1999, sometimes as much as eleven years;
• By continually misrepresenting her age, Sindi robbed opportunities for recognition, public relations support, funding opportunities and career advancement, from the very youth she proclaims to support with her new institute;
• she claimed to be 16;
• she claimed to be in her twenties;
• she claimed to be 29;
• she claimed to be 31;
• she claimed to be 32;
• Fraudulent Claims of Inventions and Patents;
• Sindi did not in a substantive way participate in the actual invention of the postage stamp-sized medical diagnostic tool developed in the lab of Professor George Whitesides at Harvard;
• It was for this invention, the invention in which she did not substantively participate, that she was exclusively honored and awarded by both Poptech and National Geographic; and
• Sindi fraudulently has claimed to have `invented' MARS, a medical diagnostic sensor, and claimed her UK-based dormant company Sonoptix, produced the sensor *57 • Sindi promotes herself as one of the world's top biotechnologists.
• Sindi appears to have her name on 2 possibly 3 patents. One patent is based on her PhD research allegedly carried out by her close friend Adrian Stevenson, also allegedly compensated ...; and
• Sonoptix is housed in an apparently empty storefront in Cambridge;
• Purportedly Sindi was brought onboard [at Nano Terra] to raise funds for the company from Saudi Arabia, and was entirely unsuccessful;
Exhibit 164 (email from Ann El-Moslimany to the Daily Beast)
• Page One:
• Since that time I began cooperating with a journalist and have undertaken extensive research on Sindi, finding far more corruption....
• Sindi's personal, professional and academic resume is fraught with complete untruths and exaggeration, proving her credentials as a scientist, a scholar, and a professional are mostly fabricated
• Currently her problematic background is not only being investigated by me, but is coming under scrutiny from both Middle East and international media outlets
• I am aware of several board members of the i2 Institute, the organization recently launched by Sindi, who have begun their own proactive investigations after my contact with them.
• Nashwa Taher, a prominent Saudi business woman, was formerly on the board and has left the i2 Institute;
• According to reliable sources, Sindi had little, if no participation, in her most publicly touted achievement - the actual scientific development and invention of the diagnostic tool developed in the Harvard lab of Professor George Whitesides and the founding of the company, Diagnostics For All. It is for this invention which was not hers, that Sindi was profiled by your article in the Daily Beast, was awarded the National Geographic Emerging Scholar Award, and was also honored with a Pop Tech Innovation Fellowship, and just recently made a UNESCO Ambassador; and
• In addition to her dubious credentials ...
• Page Two:
• Imagine when Saudi youth discovery that their hero(ine) that you helped to promote, is a fraud.
• In case you have any doubts as to the truth of my allegations a few details of my research are below, and are being further investigated by international journalists working to discover the truth about Hayat Sindi.
• I am ready to refer you directly to sources of the information that can prove her qualifications are greatly exaggerated if not fictional.
Exhibit 165 (July 10, 2016 Facebook Post by Ann El-Moslimany)
• Instead a self-promoting individual who apparently was unwill *58 ing to commit herself to the hears of grueling work that is an absolute necessity to truly excel in any field, but instead relied on feminine wiles to cajole others to achieve what she would claim for herself has managed to achieve this position.
• Further accolades and empty honors have come from McKinsey Corporation, Harvard, the US State Department, Cambridge University, National Geographic, the Clinton Foundation and even the United Nations - each one of whom has failed to look beyond Sindi's own self endorsement.
See also:
• Duplicate publication or republication of Exhibit 29, as reflected in Exhibit 31;
• Duplicate publication or republication of Exhibit 44, including Hayat Sindi in Brief, as reflected in Exhibit 163
APPENDIX B
APPENDIX B
*59 UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS HAYAT SINDI, Plaintiff, v. Civil Action No. 13-cv-10798-IT SAMIA EL-MOSLIMANY and ANN EL-MOSLIMANY, Defendants.
AMENDED FINAL JUDGMENT
October 6, 2016
This action was tried by a jury with U.S. District Judge Indira Talwani presiding, and the jury has rendered a verdict. Thereafter, the court has made further factual findings in support of a permanent injunction.
It is ordered that:
Plaintiff Hayat Sindi recover from Defendant Samia El-Moslimany the amount of $1,476,000 in compensatory and special damages; $631,808.88 in prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through August 18, 2016 (the date of the original judgment); and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.
Plaintiff Hayat Sindi recover from Defendant Ann El-Moslimany the amount of $344,000 in compensatory and special damages; $147,250.85 in prejudgment interest, which is calculated at a rate of 12% per annum, Mass. Gen. Laws ch. 231, § 6B, from January 25, 2013 through August 18, 2016 (the date of the original judgment); and costs as allowed by separate order. Post-judgment interest is awarded at a rate of .56% per annum, 28 U.S.C. § 1961.
*60 Defendants Samia El-Moslimany and Ann El-Moslimany are enjoined from repeating - orally, in writing, through direct electronic communications, or by directing others to websites or blogs reprinting Samia El-Moslimany's or Ann El-Moslimany's letters and comments - the statements:
1. That Hayat Sindi is an academic and scientific fraud;
2. That Sindi received awards meant for young scholars or other youth by lying about her age;
3. That Sindi was fraudulently awarded her PhD;
4. That Sindi did not conduct the research and writing of her dissertation;
5. That Sindi's dissertation was ghost researched and ghost written;
6. That Sindi's role in the founding of Diagnostics For All was non-existent, and that Sindi did not head the team of six people that won the MIT Entrepreneurship Competition.
IT IS SO ORDERED.
October 6, 2016 /s/ Indira Talwani United States District Judge

The majority at times relies on precedents that apply something less than strict scrutiny, which requires that a regulation of speech be "the least restrictive means of achieving a compelling state interest." McCullen v. Coakley, --- U.S. ----, 134 S.Ct. 2518, 2530, 189 L.Ed.2d 502 (2014). For example, the majority relies on the constitutional test described in Carroll v. President & Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). See Maj. Op. at 34, 35-36. But, in Madsen v. Women's Health Center, Inc., 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), the Supreme Court described the Carroll test as no different from the one applied in Madsen, ids="39742" index="504" url="https://cite.case.law/us/512/753/#p764">id. at 767, 114 S.Ct. 2516, which the Supreme Court distinguished from strict scrutiny, ids="39742" index="506" url="https://cite.case.law/us/512/753/#p764">id. at 762-64, 114 S.Ct. 2516, and which the majority here distinguishes from the form of "strict scrutiny" that it asserts applies. Maj. Op. at 35.

To support this finding, the District Court pointed to Sindi's evidence showing that the defendants "continued their libelous campaign even up to the night before trial began" and that at trial they then "both admitted under oath that they intended to continue their defamatory campaign in the future." In addition, the District Court reasoned that, "[e]ven following a jury award of $3,500,000 in damages, [the defendants'] opposition to the motion for [a] permanent injunction speaks only to their purported right to make the statements and the court's purported lack of authority to enjoin the conduct, but offers no assurances that they will voluntarily stop their tortious conduct."

The defendants' counsel did represent, in response to a question from the District Court at the hearing on the proposed injunction, that "it is not their intention to continue making these statements." But, he offered no evidence, and he conceded that the testimony at trial was to the contrary.

In the District Court, the defendants did appear to attack the enjoining of a libel under Massachusetts law. But, whether this injunction may issue under Massachusetts common law and the Massachusetts Constitution is among the issues that the defendants have failed to preserve, as the majority recognizes. See Maj. Op. at 30 n.11. In any event, any such state-law-based argument is not clearly supported by the state precedent brought to our attention by the amicus, which precedent the majority observes merely raises "doubts" about the propriety under Massachusetts law of an injunction of the kind before us but does not categorically preclude its issuance. See ids="39742" index="508" url="https://cite.case.law/us/512/753/#p764">id.

As the majority notes, the defendants did not develop a timely Seventh Amendment challenge to issuing the injunction absent a special verdict by the jury. Maj. Op. at 35-36 n.15.

The injunction cases on which the majority relies do not suggest otherwise. See Maj. Op. at 29. In two of them, the Supreme Court on its own raised arguments that the parties had not pressed only because the equitable jurisdiction of the federal courts was at issue. See Schlesinger v. Councilman, 420 U.S. 738, 743-44, 753-61, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) ; Younger v. Harris, 401 U.S. 37, 40, 43-54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). But, here, the majority assumes (without deciding) that the District Court did have equitable jurisdiction to issue the injunction, see Maj. Op. at 35, and strikes it down based solely on the defendants' personal rights under the First Amendment. The only other injunction case that the majority cites reached an arguably unpreserved argument that clearly had been raised on appeal. See Real Estate Bar Ass'n for Mass., Inc. v. Nat'l Real Estate Info. Servs., 608 F.3d 110, 125-26 (1st Cir. 2010).

There is yet another way to issue a narrower, non-constitutional ruling in this case. It is by no means clear that "whatever equitable remedy is available in a State court must be available in a diversity suit in a federal court," given the precedent that suggests that "[e]quitable relief in a federal court is of course subject to restrictions"-including that "the suit must be within the traditional scope of equity as historically evolved in the English Court of Chancery"-and "[t]hat a State may authorize its courts to give equitable relief unhampered by any or all such restrictions cannot remove these fetters from the federal courts."Guar. Tr. Co. v. York, 326 U.S. 99, 105-06, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Thus, even if there were a reason to decide this case based on defaulted arguments, I do not see why it is clear that the right defaulted argument to rely on is one that restricts the authority of not only federal courts but also state courts. And that is especially so given the care with which state courts seem to be grappling with the longstanding question concerning the scope of their own equitable jurisdiction to remedy defamation. See Roscoe Pound, Equitable Relief Against Defamation and Injuries to Personality, 29 Harv. L. Rev. 640 (1916).

In every case that the majority cites concerning this doctrine, see Maj. Op. at 27-28, the issue we reached had been, unlike in this case, timely raised by the defaulting party on appeal. See Gencarelli v. UPS Capital Bus. Credit, 501 F.3d 1, 8 (1st Cir. 2007) ; Chestnut, 305 F.3d at 19-21 ; Nat'l Ass'n of Soc. Workers, 69 F.3d at 627-30 ; La Guardia, 902 F.2d at 1012-13. Nor do the Supreme Court cases that the majority cites with respect to excusing procedural defaults address the circumstances in which appellate courts may reach issues never timely raised on appeal. See Maj. Op. at 27-28, 28-29. In Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941), the Supreme Court merely acknowledged a reviewing court's authority to reach an unpreserved issue that had been argued before it on appeal. Id. at 554-59, 61 S.Ct. 719. And, in Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the issue was whether a reviewing court may pass on a properly presented merits argument, as opposed to remanding, after reversing a lower court's dismissal for non-justiciability; the Court had no occasion to address a reviewing court's discretion to address an argument that no party had properly presented to it. Id. at 120-21, 96 S.Ct. 2868.

We have explained that the "great public moment" factor concerns whether the defaulted argument "touches upon policies as basic as federalism, comity, and respect for the independence of democratic institutions." Nat'l Ass'n of Soc. Workers, 69 F.3d at 628. It is at least not obvious to me that the defaulted strict scrutiny/prior restraint argument implicates policies of that sort, unlike the defaulted arguments about the immunities enjoyed by state legislators and municipalities in National Association of Social Workers, 69 F.3d at 627, and Chestnut, 305 F.3d at 19-20.

Nor do the interests of third parties make the First Amendment interests potentially at stake in this case any less theoretical. This injunction expressly applies only to the two defendants, and they have not challenged the District Court's findings that they likely want to use the statements only as they had used them before, which necessarily means that they are unlikely to communicate the statements to any third parties for any protected purpose.

The only precedents involving injunctions targeted at unprotected speech that the defendants cite in their supporting brief for the view that strict scrutiny applies here did not in fact apply strict scrutiny. For example, the defendants cite language from Tory v. Cochran, 544 U.S. 734, 125 S.Ct. 2108, 161 L.Ed.2d 1042 (2005), that "[a]n 'order' issued in 'the area of First Amendment rights' must be 'precis[e]' and narrowly 'tailored' to achieve the 'pin-pointed objective' of the 'needs of the case.' " Id. at 738, 125 S.Ct. 2108 (second alteration in original) (quoting Carroll, 393 U.S. at 183-84, 89 S.Ct. 347 ). They also cite language from Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), that an injunction against unprotected commercial speech should "sweep[ ] no more broadly than necessary." Id. at 390, 93 S.Ct. 2553. The Supreme Court, however, has expressly stated that a test requiring that an injunction " 'burden no more speech than necessary' to accomplish its objective" is no different from the Carroll test, Madsen, 512 U.S. at 767, 114 S.Ct. 2516, and that neither test amounts to strict scrutiny. See ids="39742" index="551" url="https://cite.case.law/us/512/753/#p764">id. at 762-64, 114 S.Ct. 2516.
Sindi does say in her supplemental brief that strict scrutiny applies here. But, it would be ironic to conclude that we are bound by her acceptance of the defendants' asserted standard of review, given that she does so in a supplemental brief that she submitted only because we chose to disregard her counsel's quite justified contention at oral argument (and repeated in her supplemental brief) that we have no reason to overturn the injunction on grounds that the defendants had not timely raised.

See also Retail Credit Co. v. Russell, 234 Ga. 765, 218 S.E.2d 54, 62-63 (1975) ; Advanced Training Sys. v. Caswell Equip. Co., 352 N.W.2d 1, 11 (Minn. 1984) ; Flint v. Hutchinson Smoke Burner Co., 110 Mo. 492, 19 S.W. 804, 806 (1892) ; Nolan v. Campbell, 13 Neb.App. 212, 690 N.W.2d 638, 652 (2004) ; O'Brien v. Univ. Cmty. Tenants Union, Inc., 42 Ohio St.2d 242, 327 N.E.2d 753, 755 (1975) ; cf. Wagner Equip. Co. v. Wood, 893 F.Supp.2d 1157, 1161-62 (D.N.M. 2012) (adopting a constitutional rule that such an injunction may issue); Hill v. Petrotech Res. Corp., 325 S.W.3d 302, 309 (Ky. 2010) (same).

The only precedents of which I am aware that have struck down injunctions in defamation cases as prior restraints did so under state constitutions. See Kinney v. Barnes, 443 S.W.3d 87, 101 (Tex. 2014) ; Willing v. Mazzocone, 482 Pa. 377, 393 A.2d 1155, 1157-58 (1978) ; see also Kramer v. Thompson, 947 F.2d 666, 669-80 (3d Cir. 1991) (applying Pennsylvania law under Willing, despite finding the authorities upholding such injunctions under the First Amendment to be "quite persuasive").

Significantly, the Supreme Court stayed its hand in Tory even though the injunction there was even broader than the one here, insofar as it permanently enjoined Ulysses Tory "and his employees, agents, representatives, and all persons acting in concert, cooperation or participation with him" from, among other things, "orally uttering statements about [the plaintiff]" in a public forum. Pet'rs' Br. at 5-6, Tory, 544 U.S. 734, 125 S.Ct. 2108, 161 L.Ed.2d 1042.

The Court also relied in both cases on the fact that "alternative channels of communication were left open to the protesters." Schenck, 519 U.S. at 374 n.6, 117 S.Ct. 855 (citing Madsen, 512 U.S. at 764 n.2, 114 S.Ct. 2516 ). That is, the protesters were "not prevented from expressing their message in any one of several different ways" so long as they were outside the buffer zone. Madsen, 512 U.S. at 764 n.2, 114 S.Ct. 2516. Likewise, the defendants here may still express any protected message through "different ways." For example, while the majority speculates that the defendants might one day wish to apologize by repeating the enjoined words, Maj. Op. at 34, the defendants could still apologize without repeating the enjoined words. Of course, that might not be a satisfactory alternative to a defamer who actually wants to apologize by using enjoined words, though it would seem to be the best way of doing so sincerely. But, where a defamation defendant objects to a proposed injunction on that ground, the district court could easily accommodate the concern by fashioning the injunction to permit the apology. Again, it is only due to the artificial posture of this case that we are concerning ourselves with the potential infringement of the expression of messages that the defendants have never said they want to express.

As explained in his thoughtful brief, the amicus would go one step further and say that even a coda would not be enough to save the injunction before us because the injunction "threatens criminal punishment [for violating the injunction] without providing the important procedural safeguards that criminal libel law provides." In my view, however, this argument, not raised by the defendants, mistakenly equates criminalizing defamation as primary conduct (as in the case of criminal libel) with criminalizing the violation of an injunction that has been issued as a properly predicated prophylactic protection against the future expression of unprotected speech found likely to recur. Certainly there were no criminal safeguards provided for in the injunctions in Madsen and Schenck. See Pro-Choice Network of Western N.Y. v. Project Rescue Western N.Y., 799 F.Supp. 1417, 1440-41 (W.D.N.Y. 1992) ; Operation Rescue v. Women's Health Ctr., Inc., 626 So.2d 664, 676-82 (Fla. 1993) (per curiam). But, the Court was not troubled by that fact, even though the underlying harassing conduct could be criminalized only by respecting those safeguards.